SALDUTTI LAW GROUP
Robert L. Saldutti, Esquire (RS5492)
Brian J. Schaffer, Esquire (BS1883)
Robert Lieber, Jr., Esquire (RL3334)
BNY Mellon Center
1735 Market Street, Suite 3750
Philadelphia, PA 19103
(610) 994-1137
*Counsel for Plaintiff, Customers Bank*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CUSTOMERS BANK | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| FRED RAPPAPORT; LIFESTYLE | : | |
| HEALTHCARE GROUP, INC.; | : | |
| VICKIE LEE A/K/A VICKY LEE RAPPAPORT; | : | |
| LIFESTYLE SPA; LIFESTYLE RE, I, LP; | : | |
| LIFESTYLE REAL ESTATE I, GP, LLC; | : | |
| LIFESTYLE MANAGEMENT GROUP, LLC; | : | |
| LIFESTYLE MANAGEMENT LLC; | : | |
| VALLEY SQUARE ONE LP; | : | |
| VALLEY SQUARE MANAGEMENT LLC; | : | |
| LIFESTYLE PLASTIC SURGERY INC.; | : | |
| GEORGE POPKY; ELIZABETH HALBREINER, | : | |
| A/K/A BONNIE HALBREINER; | : | |
| METROPOLITAN FINANCIAL HOLDINGS LLC | : | |
| A/K/A METROPLITAN BANK CORPORATIONS | : | |
| METROPOLITAN BANKCORP LTD A/K/A | : | |
| METROPOLITAN CAPITAL & FINANCIAL | : | |
| LLC A/K/A METROPOLITAN FINANCIAL | : | |
| HOLDINGS LTD; RANDALL KOHL; | : | |
| INTEGRATED ENERGY GROUP, INC.; | : | |
| GOLDIE SANTIAGO A/K/A GOLDIE DICKEY; | : | |
| MKKG, INC.; FISCAL CONDUIT, INC.; | : | |
| DIRECT MORTGAGE LENDERS, LLC; | : | |
| A.T. FINANCIAL SERVICES, LLC; | : | |
| ALLEN CORNELIUS DICKEY A/K/A | : | |
| ALLEN DICKEY; DANIEL L. MUCK; | : | |
| THE POPKY TRUST; JOHN DOES 1 – 20; | : | |
| AND JOHN DOE CORPORATIONS 1 – 20 | : | |
| Defendants. | : | |

## COMPLAINT

I.      **Parties**

1.      Customers Bank is a State chartered financial institution bank, headquartered in Wyomissing, Pennsylvania.

2.      Defendant, Fred Rappaport, "Rappaport" is an individual and the alleged CEO of Lifestyle Healthcare Group, Inc. Rappaport resides at 2221 Sand Trap Road, Jamison, PA 18929.

3.      Defendant, Lifestyle Healthcare Group, Inc., "LHG" is believed to be a Delaware Corporation believed to conducted business in the Commonwealth of Pennsylvania located at 790 Newtown Yardley Road in Newtown, Pennsylvania and 998 Second Street Pike, Second Floor, Richboro, PA 18954. LHG was the entity on a vehicle used by the Defendants to obtain funding from Customers. LHG is believed to own 85% of Lifestyle Real Estate, I, LP, a Delaware Limited Partnership. Lifestyle Real Estate, I, GP, LLC is believed to own 11% of Lifestyle Real Estate I, LP. The development of the project was to take place at 1-2 New Road, Bensalem, PA.

4.      Defendant, Vickie Lee a/k/a Vicky Lee Rappaport, "Vicky Rappaport" is an individual and the wife of Fred Rappaport who is a principle and/or senior officer of Lifestyle Healthcare Group, Inc. Vicky Rappaport also owned and/or controlled Lifestyle Spa. Vicky Rappaport resides at 2221 Sand Trap Road, Jamison, PA 18929.

5.      Defendant, Lifestyle Spa is believed to be owned and/or controlled by Vicky Rappaport.

6.      Defendant, Lifestyle RE, I, LP, "Lifestyle RE I" is a Delaware Corporation and Limited Liability Partnership controlling and owning real property in Bucks County, Pennsylvania.

7.      Defendant, Lifestyle Real Estate I, GP, LLC, "Lifestyle Real Estate" is believed to be a General Partnership owing 11% of Lifestyle Real Estate I, LP, a Delaware Limited Partnership.

8.      Defendant, Lifestyle Management Group, LLC, "LMG" is a limited liability corporation owned and/or controlled by LHG.

9.      Defendant, Lifestyle Management LLC located at 790 Newtown-Yardley Road, in Suite 425, Newtown, PA 18940.

10.     Defendant, Valley Square One LP; is a Delaware corporation believed to be controlled by Fred Rappaport located at 4737 Concord Pike, Wilmington, Delaware 19803.

11.     Defendant, Valley Square One LLC is a corporation controlled and owned by Fred Rappaport operating out of a P.O. Box 7189, Wilmington, Delaware.

12.     Defendant, Valley Square Management LLC is a corporation controlled and operated by Fred Rappaport located at 1098 Wash Crossing Road, Washington Crossing, PA 18977.

13.     Defendant, Lifestyle Plastic Surgeon One LP is a corporation controlled and owned by Fred Rappaport.

14.     Defendant, Lifestyle Plastic Surgery Inc. is a corporation owned and controlled by Fred Rappaport.

15.     Defendant, George Popky, "Popky" is a medical doctor and resides at 8801 Crefeld Street, Philadelphia, Pennsylvania.  Popky at various times served as the officer and/or other owner of Lifestyle Healthcare Group and his related and affiliated partnerships, corporations and/or LLCs. Popky, along with Rappaport controlled and/or operated the various shell corporations.

16.     Defendant, Elizabeth Halbreiner, "Halbreiner" a/k/a Bonnie Halbreiner was the Senior Vice President, Regional CLO for Customers Bank and resides at 29 Bedford Lane, Newtown, PA 18940.

17.     Defendant, Metropolitan Financial Holdings LLC a/k/a Metropolitan Bank Corporations, "Metro", located in 219 SW C Avenue, Lawton, OK 73501;

18.     Defendant, Metropolitan Bancorp LTD a/k/a Metropolitan Capital & Financial, LLC a/k/a Metropolitan Financial Holdings LTD, collectively "Metro" along with the above referenced Metropolitan Financial Holdings LLC a/k/a Metropolitan Bank Corporations are corporations conducting business nationally and internationally.  Metro identifies its USA branch at 219 SW C Avenue, Lawton, OK 73501, its New Zealand branch as being located at 40B Esk Street, Parkvale, Tauranga, New Zealand 3112, and its Panama branch as located at Azuero Business Center, Suite 514, Avenida Perez Chitre, Panama, 0601-00395.  Metro contends it's registered to conduct business and/or is licensed in Australia, New Zealand and Panama.  Metro held itself out as a financial entity with substantial assets which was a complete fabrication.  Metro used various related names and was the alter-ego of Santiago.

19.     Defendant, Randall Kohl, "Kohl" as an individual residing at 7250 Franklin Avenue, Suite 207, Los Angeles, CA 90045.  Kohl is either an agent or affiliate of Metro.

20.     Defendant, Integrated Energy Group, Inc., doing business as IEG, LLC, "IEG" is a California Corporation located at 4000 West Valley Boulevard, Suite 105, Walnut, CA 91789.  IEG is an entity controlled and used by Kohl.

21.     Defendant, Goldie Santiago, also known as Goldie Dickey, "Santiago" is an individual residing at 11147 NE Wolf Road, Fletcher, OK 73541 and a controlling member behind Metro.

22.     Defendant, MKKG, Inc., "MKKG" is a corporation conducting business in Lawton, Oklahoma.  Believed to be controlled and/or owned by Santiago; sharing an identity of interest with Santiago.

23.     Defendant, Fiscal Conduit, Inc., "Fiscal" is believed to be a corporation controlled by Dickey located at 219 SW C Avenue, Lawton, OK 73501; sharing a common identity of interest with Santiago.

24.     Defendant, Direct Mortgage Lenders, LLC, "Direct Mortgage" is believed to be a company controlled by unknown individuals and located at 3617 Highland Avenue, Highland, CA 92346.  Upon information and belief, this is controlled by Kohl.

25.     Defendant, A.T. Financial Services, LLC, "A.T." is believed to be a corporation located at 219 SW C Avenue, Lawton, OK 73501 and the alter-ego of Santiago and/or Dickey.

26.     Defendant, Allen Cornelius Dickey, also known as Allen Dickey, "Dickey" is an individual and believed to be located at 11147 NE Wolf Road, Fletcher, OK 73541. Dickey has held himself out as an officer of Metro.

27.     Defendant, Daniel L. Muck, "Muck" is an individual residing at 1614 Tamanend Drive, Quakertown, PA 18951.  Muck is the son of Vicky Rappaport.  Muck received substantial payment from the insolvent LHG.

28.     Defendant, The Popky Trust, "The Trust" is believed to be a trust located at 8801 Crefeld Street, Philadelphia, Pennsylvania. This entity was created by Popky to hinder creditors and to shield assets controlled and operated by Popky.

29.     John Does 1 through 20 are the unknown individuals who have defrauded Customers Bank and/or assisted other defendants in defrauding Customers.

30.     John Doe Corporations 1 through 20 are the unknown limited liability company, corporations, limited partnership, trust entities, related unknown entities that engaged in conspiracy to defraud Customers Bank or assisted in defrauding Customers.

**II.**     **Jurisdiction and Venue**

31.     This Court has subject matter jurisdiction pursuant to provisions of 28 U.S. Code § 331. More specifically, plaintiff seeks relief under 18 U.S. Code §§ 1961-1968.  Therefore § 331 vests this Court with subject matter jurisdiction.

32.     The Court's supplemental jurisdiction pursuant to 28 U.S. Code § 1367 is also invoked to empower the Court to hear claims arising under the statutes in common law of the Commonwealth of Pennsylvania that form a part of the same case in controversy.

33.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S. Code  § 1391 (a) because a substantial part of the events or admissions giving rise to the claim occurred in the Commonwealth of Pennsylvania and Defendants  Rappaport, Halbreiner and Popky, all reside within the Eastern District of Pennsylvania.

### III.     Preliminary Statement

34.     This is an action arising out of Defendant's massive scheme to defraud Customer's

Bank of over $9.0 million dollars.  The illegal scheme, orchestrated to steal over $9.0 million dollars

from Customers a Federally insured financial institution, arose out of the participation of numerous

individuals and conspirators including Rappaport, his wife Vicky Rappaport, their son, Muck,

Halbreiner, a former employee of Customers and Santiago of Metro, Kohl and unknown individuals

and/or corporations.  The scheme was simplistic:  obtain a $9.0 million dollar loan using a fraudulent

and/or counterfeit standby letter of credit or "SBLOC".   A SBLOC is a guarantee of payment issued

by a Bank on behalf of a client that is issued as collateral on a loan.  The SBLOC is essentially "cash"

or cash equivalent form from collateral for a loan.  The SBLOC that was submitted to Customers was

fraudulent and counterfeit.  (Halbreiner assisted, acted in collusion with and/or orchestrated a $9.0

million dollar loan with a fictitious and/or fraudulent SBLOC.)  The "collateral" or SBLOC issued or

arranged by Metro along with Santiago was counterfeit and/or fraudulent.  Metro has a long tortious

history of deceptive and fraudulent financial crimes throughout the United States and internationally,

including other Federal cases, wherein they have been implicated including R.B. Development, CO.,

LTD v. Metropolitan Financial Holdings, LTD, et als. U.S. District Court, Eastern District of New

York, Case No. 1:12-cv-01460 and Payer v. Berrones et als., U.S. District Court of New Jersey, Case

No. 1:12-cv-01704-RMB-JS.  Metro contends that with a SBLOC, a business will be deemed

"trustworthy" and knew that with the use of a fraudulent SBLOC, the party would obtain credit.

35.     Rappaport has a history of deceptive business dealing, including prior bankruptcies

with Delaware Valley Plastic Surgery Center and personal bankruptcies (2:09-bk-18320), which is a

similar pattern of conduct.  Rappaport has been a longtime fraudster, defrauding individuals, family

members and financial institutions from funds including investors from projects undertaken by

Rappaport.  Rappaport has a long history of deceptive business practices and failed projects.

Rappaport's contention that he has "more than thirty (30) years' experience in the initiation and

development of successful businesses" is a misrepresentation.

36.     Rappaport and Popky obtained funding from investors to create a "Lifestyle Health

Facility" in Bensalem, Pennsylvania.  The project was a scheme to defraud Customers and had no

ability to be completed.  The $9.0 million dollars that was obtained as a loan from Customers was used

largely for Rappaport, Vicky Rappaport's day spa and to fund Popky and the Rappaport's lifestyle.

Funds were siphoned off into the spa and used by others to fund their lavish lifestyle.

37.     The principals of LHG transferred and/or placed the property at 1 New Road,

Bensalem, PA 19020 into Lifestyle Real Estate I, LP.  The reason for this was to defraud creditors,

specifically, Customers.  In conjunction with this, Rappaport arranged for a "kick-back" to be made to

Halbreiner in order to foster and encourage her assistance in acquiring the loan from Customers.

Halbreiner acted in collusion with Rappaport to obtain the loan from Customers Bank and received

improper financial benefit in connection with such assistance and/or collusion.  This was necessary to

allow for the $9.0 million dollar loan to be funded.  Halbreiner was critical to the loan being granted.

Halbreiner actively participated in and deliberately shielded the deception, even after the 1st SBLOC

was fraudulent.

38.     Rappaport along with Vicky Rappaport, Muck and Popky orchestrated a massive fraud

against Customers.  LHG had no income, no revenue, no verifiable projections.  The funds from

Customers was a "money grab".  It was a scheme to defraud Customers.  The scheme was uncovered

as a result of Customers' attempting to redeem a standby letter of credit and being notified that the

SBLOC was fraudulent, counterfeit and/or otherwise fake.  The sole security for the $9.0 million

dollar loan was a fraud.

39.     Defendants, Rappaport; Popky; Santiago; Vicky Rappaport; Kohl and Muck, along with other individuals who are unknown John Does 1 through 5, at various times forwarded documents and related communication to Customers, including LHG's Business Plan, which were relied upon by Customers.  The business plan that was submitted by the Defendants was an intentionally deceptive document providing information which would lend it to have credibility including a document that listed itself as a "memorandum and confidential".  The memorandum was used allegedly to elicit investor participation, as well as the extension of funding from third parties including Customers.  The memorandum or business plan was a scheme, intentionally deceptive with little or no factual basis.  Embodied in the memorandum were listed various communications, including an overview of the project which was deceptive. The memorandum included statements that, "Lifestyle Healthcare Group, Inc. is currently raising equity capital to fund the corporation through various limited partnerships in the project.  Invested funds will be used for the following:  Equipment, marketing, operation expenses and expansion." This statement was false and misleading.  Only a limited amount of the funds that were disbursed from Customers were used for equipment, marketing, operation expenses or expansion.  Rather it was used to fund the lavish lifestyles of Rappaport and Popky, including the transfer of funds from the Customers loan to Popky's Trust.  The funds were further dissipated to Vicky Rappaport's Spa, her son, Muck's, living expenses and the furtherance of the scheme.

40.     Further, misrepresented in the memorandum stated that, "we acquired 10.75 acres of ground to construct a 200,000 square foot multi-specialty outpatient medical diagnostic and surgery center along with the an 80,000 square foot LTC long-term acute care/specialty care hospital that will be strategically located near Routes 1, I-95 and the Pennsylvania Turnpike.  We are in negotiations requiring an additional five (5) acres for the athletic complex."  This representation was blatant and

false, and in fact, approximately 6.0 acres were acquired.  Further, despite the submission of this business plan to Customers; Popky and Rappaport subsequently acquired additional financing from Kennedy Funding that was placed in the form of a mortgage on the real property in Bensalem, PA.  In essence, they fraudulently obtained approximately $12.0 million dollars to fund "Lifestyle".   Further misrepresentations included that, "a local company has agreed to construct the main 200,000 foot facility 80,000 square foot hospital skilled nursing building and parking structure.  We are in negotiations with several parties who have expressed willingness to fund the construction."  This was a complete fabrication.  There was an agreement, but little else.  In order to induce investors, the fraudsters created an illusion of viability with an elaborate website, business plan and related documents.  It was nothing more than a scheme to defraud Customers.

41.     Further misrepresentations included, "Mr. Rappaport has more than 30 years' experience in the initiation and development of successful business including capital acquisition and business operations.  He's formerly founder chairman and CEO of Medeikon Corporation a medical device company using optical technology for cardiovascular applications where he raised more than $10 million in startup monies  …"  Rappaport represented that he maintains several CEO and chairman positions in high-tech startup companies including Quison Technology.  These were failures.  Rather, Rappaport has been a fraud throughout his life.  This included the development and fraudulent conduct of filing bankruptcy twice, including Delaware Valley Plastic Surgery Center which has eerily similar characteristics of the Lifestyle fraud.

42.     Throughout the process of funding the $9.0 million dollar loan that was extended to LHG, various false representations were made to Customers, as well as other individuals.  The loan was fraudulent at inception and the scheme proceeded forward with the help of Halbreiner, who, upon information and belief, received a fee and/or "kick-back" from Rappaport, the borrower and related

Defendants.  The entire project was a scheme at its inception.  The Defendants conspired to defraud

Customers via a litany of fraudulent statements and deceptive communications including the issuance

of a counterfeit or fictitious SBLOC from Metro, Kohl and Santiago.  Upon information and belief, the

scheme was fostered by the submission of the punitive counterfeit SBLOC documents, via mail and/or

FedEx.  The scheme was aided by providing a fee or kick-back to Halbreiner, a loan officer of a

federally insured banking institution.  The SBLOC was forwarded via mail or other common carrier

with a fee carved out for Metro to be paid at loan closing and with a payment to Halbreiner.

43.     Halbreiner was a key party to the scheme and upon information and belief even

intended to travel to New York with Rappaport to meet with individuals and/or assist Deutsche Bank

in order to issue the originally counterfeit SBLOC.  On or about June 17, 2013, Halbreiner forwarded

communication to third parties stating "proof of funds" letter to potential brokers.  This

communication was forwarded even though Rappaport and Lifestyle didn't have any funds at

Customer or availability with any existing credit facilities.  Halbreiner, as a senior lender of

Customers, knew this would be misleading.

**<u>EMAIL COMMUNICATION</u>**

44.     On June 21, 2013, Halbreiner forwarded a series of communications to senior

management at Customers advising that another standby letter of credit was being submitted after the

initial Deutsche Bank letter was deemed counterfeit, despite complete knowledge by Halbreiner of the

Deutsche Bank SBLOC being fake, she continued her assistance in the fraud.  Halbreiner's

communication was forwarded despite Halbreiner's knowledge that Lifestyle had no income, no

revenue and essentially no assets.   Rappaport assisted in forwarding emails that were either false or

misleading, which he knew would be relied upon.  Rappaport, Popky and Halbreiner were aware that

Metro and Santiago were obviously a scam.  Halbreiner knew that a SBLOC or letter of credit needed

liquid collateral, which Rappaport did not have.  Halbreiner, despite being in receipt of an initial

fraudulent Deutsche Bank SBLOC, continued to market and engage other third parties concerning

letters of credit.  Halbreiner, a senior lender with over 30 years' experience, assisted and colluded in

the scheme by ignoring the initial counterfeit letter, disregarding the lack of collateral of the borrower

or any other Defendants needed to support a legitimate SBLOC, ignoring the absence of any viable

financial plan to support the project, engaging in other dishonest acts and despite all of the foregoing,

allowing the loan transaction to proceed to closing.

45.     On July 29, 2013, in furtherance of the scheme and to conceal her role, Halbreiner

opened a PNC Bank account on the exact day LHG was originally scheduled to close on their loan

with Customers.  This would allow her personally to use electronic accounts, electronic checks,

account transfers and also to hide her actions from Customers.  The date July 29, 2013 corresponds

with the date that the Customers $9.0 million loan was scheduled to initially close.  Closing was

postponed since the initial SBLOC allegedly obtained from Deutsche Bank was deemed fraudulent as

a result of concerns raised from outside counsel for Customers.  On July 30, 2013, Halbreiner emailed

Fred Rappaport at 5:04 p.m. with "FYI SPL Site" in the subject line outlining the apparent transpired

fraudulent documents submitted by Deutsche.  Halbreiner was unfazed that Customers was almost

defrauded of $9.0 million.  Halbreiner failed to immediately stop the funding process concerning the

fraudulent documents submitted allegedly from Deutsche.  Halbreiner rather than stop the funding

process worked to obtain a "better" SBLOC that would pass security.  The fraud could only be

accomplished with a senior banker that was involved in the scheme.

46.     Halbreiner waited almost 48 hours to notify Customers of the first Deutsche Bank

counterfeit SBLOC.  Halbreiner sent an email to counsel for Customers Bank regarding the fraudulent

Deutsche Bank SBLOC. Halbreiner, also during the same period, was attempting to engage and assist Santiago to provide a SBLOC as collateral for other potential borrowers.

47.     On August 5, 2013 Customers' outside counsel notified Halbreiner of Metro's background.  Counsel sent a link to a government site, which is a regulatory bulletin advising all financial institutions that Metro is <u>not</u> licensed or registered or even supervised by New Zealand authorities.  Counsel for Customers states, "I trust Fred is proceeding with caution."  Halbreiner then forwards this email to Rappaport with <u>FYI</u>.  No other communication was made concerning this apparent knowledge that Metro was a rogue financial institution.  Halbreiner did not forward this communication to anyone senior at Customers.  Despite knowledge that the financial broker that Rappaport was using to obtain a SBLOC for over <u>$9.0 million dollars</u> was the subject of a governmental warning concerning fraudulent conduct, Halbreiner continued with the scheme. Halbreiner knew that the $9.0 million dollar loan's sole security was to be the counterfeit SBLOC.

48.     Both Rappaport and Halbreiner exchanged a series of suspicious emails.  On August 23, 2013, a "suspicious" email from Rappaport to Halbreiner stating "TD line which is attached."  Halbreiner then forwards communication to Customers' outside counsel on August 23, 2013 at 9:13 a.m. asking counsel to verify the language which is acceptable and also wants to know his additional legal fee.  Conversely, counsel responded at 10:32 a.m. stating that the language is standard and acceptable.  Counsel then advises that he will get the modification agreement and fee to her later this morning.  Halbreiner failed to provide counsel with the complete picture of the fraudulent documents, apparently attempting to maintain a veil of secrecy from Customers' outside counsel.

## <u>AUGUST 29, 2013</u>

49.     On August 29, 2013 the day of funding on the $9.0 million loan, Halbreiner emails Rappaport at 9:05 a.m. stating, "have not received yet it was supposed to be here by 8:30."

(Halbreiner appeared to be panicking.)  Rappaport replies at 9:09 stating "FedEx said they delivered it to the front desk signed by R. Moody."

50.     Halbreiner responds at 9:10 a.m. and forwards the email to Jonathan Klass ("Klass"), an employee at Customers, asking if he can see who R. Moody is.  Klass responds at 9:22 that R. Moody works at the credit union downstairs, a business unrelated to Customers.  Incredulously, Rappaport responds at 9:35 a.m. claiming to be at the Customers' office with Klass and that, "it looks fine.  Happy Birthday … we got it done!"

51.     Halbreiner appears not to have been at the bank location, however; she later claimed to have verified the validity of the SBLOC with TD Bank representative on August 28, 2013.  Halbreiner explained that she had received a call from "someone" at TD Bank verifying that the letter of credit was being sent, although she was unable to recount the name of that person or the phone number. Halbreiner also failed to keep any records of the conversation.  Halbreiner's statement made to Customers upon discovery of the counterfeit SBLOC cannot be rectified with the facts.

52.     At 1:05 p.m. on August 29, 2013, Halbreiner emails Rappaport, "everything has been disbursed.  I will be sending an email to release the money in the account."  The $9.0 million dollar conspiracy to defraud Customers was complete.

## THE FRAUD CONTINUES

53.     On December 31, 2013, James Hornack communicates via email to Halbreiner regarding Kohl's trying to reach her with "urgent" communication.

54.     On January 15, 2014 Bob Halbreiner, (husband of Halbreiner) responds to Germetru@aol.com and Halbreiner regarding confirmation received Jay's save the date announcement.  Robert, also known as Bob Halbreiner's response is, "great at Philadelphia airport waiting for delayed flight to Greenville, South Carolina travel sucks."  The alleged TD standby letter of credit was apparently sent from Greenville, South Carolina.  On Saturday, February 1, 2013, Kohl sent communication to Rappaport about another TD letter of credit attempting to obtain another loan. The Defendants sought to replicate a "real" TD Bank letter of credit.  This is an unrelated transaction. Halbreiner is copied on this email, even though Customers has no involvement in the transaction.   The letter of credit that is attached in that email is different from the TD document that Halbreiner previously accepted for the Lifestyle loan.  The documents are dramatically different in appearance as well as content.  Halbreiner raises no concern.  Kohl explains, "the attached SBLOC language that Customers Bank likes".  The co-conspirators are attempting to obtain additional funds from Customers.

55.     On August 7, 2013, Halbreiner notifies Rappaport of an overdraft on his checking account and responds "FYI this is starting not to look good."  At this juncture, Lifestyle had repeated overdrafts yet Halbreiner raises no alarms to any senior authority at Customers.  Despite the knowledge that LHG had a loan for $9.0 million dollars, Halbreiner only seeks to ensure the fraudulent scheme continues and potentially fund future loans with another counterfeit SBLOC.

56.     On August 8, 2014, Kevin Beauparlant communicates to Halbreiner that Rappaport was in and he made a deposit from Popky's personal account for $11,600.00 and another deposit for

tomorrow for $6,000.00 from the Lifestyle One LP account at Univest.  Beauparlant requests "how can he transfer from Popky's personal account."  Halbreiner raises no concerns.

57.     On January 28, 2015, communication is sent between Rappaport and Halbreiner concerning Lifestyle's continual overdraft.   Rappaport advises Halbreiner that he wants information on their real estate appraisal and, "he needs a correct one now for our $3.5 million loan."  This communication centers upon Lifestyle obtaining additional funds on the Bensalem property. Halbreiner raised no concern that the source of the $9.0 million dollar Customers loan was in jeopardy.  Halbreiner raised no concern about a third-party funding source being needed for this project and the fact that there was a continued pattern of overdrafts in the checking account of LHG. Halbreiner did not object because she was part of the conspiracy.  Halbreiner had also tried to orchestrate another loan for $10 million dollars using Metro attempting to place the loan in a different business unit of Customers.  The LHG loan defaults on July 21, 2015.  Customers attempts to exercise its rights on the SBLOC.

58.     On or about July 21, 2015, Halbreiner received communication from TD that the letter of credit was fictitious.  The scheme begins to unravel.

## MICHAEL FUOCO

59.     Michael Fuoco, "Fuoco", the former Chief Operating Officer of Lifestyle has provided information that LHG was an insolvent entity and its principals had engaged in a pattern of deepening insolvency and were the alter-egos of the various insolvent entities.  Fuoco stated that Halbreiner had received a "kick-back" and was compensated for the transaction involving the loan from Rappaport and others.  Fuoco specifically questioned Rappaport as to whether they "needed to take care of Halbreiner" and was advised, "she had already been taken care of".  Fuoco stated this compensation was a kick-back to Halbreiner.

60.     Fuoco stated that the real property located in Bensalem was transferred and/or placed in the name of Lifestyle Group LP, I, in order to avoid creditors and was done to hinder creditors including Customers.

61.     Fuoco stated that when funds were disbursed from the Customers loan, Popky transferred a half a million dollars to a trust presumably based in California controlled by Popky. These funds were transferred at a time when the corporation was insolvent and the only funds were the loan funds provided by Customers.  Popky was an insider.  The funds were to be used for the development of LHG.  However, the loan proceeds were a "money grab" by Popky, Rappaport and others.  They used a substantial amount of the $9.0 million dollars allotted to LHG for their personal use.

62.     Upon information and belief, Rappaport, Popky and Vicky Rappaport operated various corporations and limited liability entities and/or limited partnerships, which were there alter ego, and shared common identity of interest with the Defendants.  These include Lifestyle I, LP also known as "the Spa"; Lifestyle Management, LLC, "Management"; Lifestyle Real Estate I, LP, "Real Estate" and Lifestyle Healthcare Group, Inc. "Healthcare".  Additionally, the Defendants organized an additional entity known as Lifestyle Holdings, LLC.

63.     Defendants appear to have been insolvent, undercapitalized and were clearly the alter ego of Defendants, Popky; Rappaport and Vicky Rappaport.  Vicky Rappaport appears to have received substantial income for virtually no work other than working at the Spa entity.

64.     Healthcare reported a loss of over $3 million in 2014 with gross receipts of $200,000.00.

65.     Despite the representations that Healthcare was a viable entity, the 2013 tax return reports interest as the only source of income in the amount of $47.00 and a 2012 tax return reflected no income.

66.     Healthcare also reported a net operating loss of approximately $2.4 million dollars in 2014.

67.     Healthcare listed in their tax return $4.8 million dollars of assets on the 2014 tax return. However, approximately $3.4 million dollars represents an investment in real estate.  This appears to be the same real estate that Kennedy Funding also funded in the amount of $3.5 million dollars.

68.     Compensation of the officers was listed anywhere from zero to $250,000 in the years 2012 through 2015.

69.     Management's 2014 tax return reported a loss of $26,000.00 and zero income.

70.     Financial documents disclosed the value of the land at $1.0 million as construction in progress.  This appears to be a complete fabrication.

71.     The "Spa" which was controlled and owned and/or operated by Vicky Rappaport indicated income of $94,000.00 in 2014 but had a taxable loss of $250,000.00 reported.  The Spa's tax return revealed a consistent loss of over $200,000.00 on an annual basis.

72.     Fuoco, the former Chief Operating Officer indicated that the payroll for the Spa, an unrelated entity was also being paid by the proceeds of the Customer's loan.

73.     Financial statements produced by the Defendants indicated on a combined basis, Defendant Corporations had substantial losses of over $2.2 million dollars and $1.5 million dollars in 2014 and 2013.

74.     The Defendants' tax return listed assets in 2014 totalling $10 million dollars and $7 million dollars in 2013.  Defendants represented two-thirds of the value of the assets as land and construction in progress.  There appears to be little or no basis to make that representation.

75.     Further investigation indicated that the notes of the financial statement for 2014 described a period of 2013 adjustment.  The financial statement indicated approximately a $1 million adjustment was attributable to financing costs and capitalized interest incorrectly recorded as construction in progress in 2013.

76.     Financial statement notes disclosed a $3.5 million line of credit obtained by Real Estate in March 2015.  This discloses the Kennedy financing which was an additional loan on the property which was ultimately to be used as security for Customers.

77.     It appears based upon a review that there were substantial funds disbursed from these entities.  There appear to be substantial payments for personal expenses paid from Healthcare to American Express.

78.     During this period, Healthcare had total disbursements of $15,622,597.00 less adjustments of $5,116,389.00 for a total adjusted disbursement of $10,506,208.00.

79.     At the same time, Management had adjusted disbursements of $63,761.00 and the Spa had total disbursements of $814,415.00.

80.     The total disbursements were $11,383,384.00 for adjusted disbursements for all the entities including Healthcare, Management and Spa.

81.     These disbursements are from entities and individuals with essentially no income.  The corporations were insolvent.  The pattern of conduct by the officers created a pattern of deepening insolvency.

**V.**     **Action and Furtherance of the Scheme**

82.     At various times, the Defendants forwarded communication including the purported

FedEx package that contained the letter of credit and a standby letter of credit which was fraudulent

and deceptive.  Said actions and actions is a violation of 18 U.S. Code § 1343.

## COUNT ONE

## CIVIL RICO

83.     As to Santiago; Rappaport; Vicky Rappaport; Popky; Halbreiner; Kohl and Metro; Plaintiff realleges each and every allegation and fraud set forth in Paragraphs 1 through 82 as if set forth herein at length.

84.     Allegations of Racketeer Influenced and Corruption Organization Act, 18 U.S. Code § 1962(d), Civil RICO conspiracy against the following Defendants include Santiago; Rappaport; Vicky Rappaport; Popky; Kohl; Halbreiner and Metro.

85.     In violation of 18 U.S. Code § 1962(d), defendants as outlined conspired with each other to conduct affairs of the RICO Enterprise in violation of 18 U.S. Code § 1962(d), as detailed above.

86.     Upon information and belief, Defendants agreed to conduct or participate in a RICO Enterprise Affairs through a pattern of racketeering activity which Defendants knew or should have known included a scheme to defraud plaintiff Customers Bank by means of mail fraud and/or wire fraud within the meaning of 18 USC 1343 over an extended period of time.  The Defendants also engaged in bribery by providing a "kick-back" to Halbreiner.  Metro has had a long and extensive history of defrauding third parties through a series of negotiable instrument, in this case, a standby a letter of credit.

87.     Upon information and belief, Metro and Santiago engaged in a long pattern of deceptive practices in issuing standby letters of credit as well as other financial documents to third parties including Customers.  Metro and Santiago have been the subject of numerous claims concerning fraudulent negotiable instruments and/or securities and related transactions, including transferring these negotiable instruments nationally and internationally.

88.     The Metro entities are a fraudulent enterprise which received part of the funds either directly or indirectly from Customers.  Metro has presented itself as a financial institution entity.  Part of Metro's role was to falsify and deceptively assist the fraudulent transaction as a normal and standard part of its commercial transaction involving the use of letters of credit and standby letters of credit.  Metro and its principals worked with defendants including Rappaport, Halbreiner and related defendants in the transaction of depositing the funds wrongfully taken from Customers.  This included a commission payment in excess of $1.0 million dollars paid on a $9.0 million dollar loan transaction.  Upon information and belief, Metro received over $1.0 million dollars from the counterfeit letter of credit.

89.     Defendant, Santiago is an officer, owner or director of Metro and used the corporate format to participate in ongoing frauds around the United States and internationally.  Metro holds itself out as a Licensed Financial Institution with Licenses from Australia, New Zealand and Panama, as well as the United States.

90.     Defendant Santiago is an officer, owner and/or director of Metro and published online:

> I serve as the International Banking Relationship Manager for Metropolitan Financial Holdings Ltd., formerly known as Metropolitan Bancorp Ltd. Through my work, I became the Institutional Affiliate for Estrategia Investimentos S.A., a bank located in Brazil.

91.     Santiago is a fraudster with a criminal past, including financial crimes. The above representation discloses his position with Metro.

92.     This fraud involved specific parties as outlined above.  The scheme was that the Plaintiff would pay a one percent (1%) charge included in the request for funding by Lifestyle and obtain funds, which Metro and Halbreiner receive a kick-back for defrauding Customers.  Customers' loan officer, Halbreiner, knew that the standby letter of credit was fictitious and/or fraudulent.  Upon information and belief, Halbreiner had already received a Deutsche Bank standby letter of credit,

which was fraudulent and fictitious.  Despite the initial submission of a fraudulent fictitious document identified by outside counsel for Customers, Halbreiner, undaunted, continued the scheme by obtaining a standby letter of credit, purportedly from TD Bank.  The transaction was conducted via mail or other common carrier.  The kick-back to Halbreiner was essentially a bribe of a loan officer at a Federally Insured Financial Institution.

93.     The scheme continued over a lengthy period of time.  Santiago, Rappaport and others continually represented they were viable institutional entities and their role was to falsely and deceptively portray the fraudulent transaction as a normal financial transaction.  Rappaport and Halbreiner knew or should have known these transactions were harmful and they intentionally misled Customers.  Halbreiner intentionally failed to disclose the fictitious Deutsche Bank standby letter of credit.  The SBLOC induced Customers to extend a $9.0 million dollar loan on a worthless SBLOC – essentially, a theft from Customers.

94.     Upon information and belief, Santiago, apparently a convicted felon, is married to Allen Dickey ("Dickey").  Kohl and Koray Gurocak are listed as Managing Directors.  Dickey is also listed a Founder of Kohl's company, IEG - Integrated Energy Group Inc. d/b/a IEG Capital, Inc. These corporations appear to be insolvent and were shell corporations used to foster and continue the schemes against third parties, including Customers.

95.     Metro has attempted to operate as a bank or other financial entities in the U.S. without being licensed.  As set forth, Metro claimed to be a registered bank in New Zealand, Australia and Panama.  On Metro's website, they lost licenses, which appear to mislead the public.  Upon information and belief, New Zealand and Australia do not have any valid registration or banking registers for these entities.

96.     Upon information and belief, Santiago is a rogue criminal who was previously sentenced to State Prison in California resulting from felony charges connected to a real estate fraud.

97.     Halbreiner was on notice that Metro was identified as a company was not licensed or supervised by the Reserve Bank of New Zealand or had a New Zealand banking license.  It was not registered as an off-shore financial corporation as claimed on its website.  Despite this information, Halbreiner continued with the fraud and failed to disclose this to senior members at Customers.

98.     A SBLOC is a negotiable instrument with the instrument being only as viable as the underlying credit of the issuer and the validity of the instrument itself.  The document that was submitted to Customers was worthless and fraudulent.  Further, Rappaport apparently failed to execute the indemnification agreement which would have triggered his responsibility.  Rappaport knew that he had a requirement to do this.  Halbreiner knew that Rappaport did not have the collateral or financial wherewithal to support this SBLOC.

99.     On July 19, 2013, Defendant, Rappaport entered into a transaction with Customers for a loan in the amount of $9.0 million dollars.  Halbreiner was a senior lender at Customers who had an extensive history with Rappaport.  Rappaport, along with his partner, Popky, devised a scheme to allegedly construct "a lifestyle location", which had little or no chances of ever being built.  Rappaport and Popky had no expertise in development of a lifestyle project or healthcare complex.  In fact, Rappaport had been engaged in a series of fraudulent and deceptive practices over a long business life.

100.    The scheme was only successful as a result of Halbreiner being a representative and loan officer at Customers.  Her clandestine activities included failure to immediately notify senior individuals at Customers that the initial standby letter of credit presented to Customers was fraudulent.  This initial standby letter of credit from Deutsche Bank should have triggered any individual at her level that the transaction was fraught with problems and was most likely a scheme to defraud the bank.

Halbreiner did not do this because she was a part of the scheme receiving payments for having completed the funding of the loan and/or received a bribe.

101.    Throughout the process, Rappaport and his cohorts provided false and misleading information, which included false statements about the viability of the proposed facility.  In fact, the business documents that were submitted to Customers which were relied upon were false and misleading.  On August 29, 2013, Customers received a standby letter of credit as outlined previously which was fraudulent and/or counterfeit.  Immediately, Halbreiner released $9.0 million dollars to Rappaport and his cohorts which resulted in a "money grab" for the Defendants.  Rappaport, Popky, Vicky Rappaport and Halbreiner were part of the RICO Enterprise, which was an attempt to defraud Customers.  Throughout this process Metro, Kohl, and Santiago represented that they were legitimate businesses trading and providing standby letters of credit on behalf of Metro.  Santiago knew along with Halbreiner and Rappaport that these documents were false negotiable instruments.  Specifically, Santiago knew that the investments were worthless and that the underlying standby letter of credit was essentially a scheme with no value and no bank or other financial institution would be honoring the instrument and providing funds as represented.  The Defendants knew that the SBLOC had no value and would be worthless if presented by the holder due to a default on the underlying loan agreement.  The Defendants knew the Co-Defendants had no financial viability to support the SBLOC.  Throughout the transaction, Santiago, as well as the other Defendants, including Rappaport, Popky and Halbreiner, knew that the loan/standby letter of credit was fraudulent.  The participation of Rappaport, Popky, Halbreiner and related cohorts were perpetrating a large-scale fraud upon Customers.  Following disbursement of the $9.0 million dollars, the cohorts engaged in a "money grab" essentially using a substantial portion of loan proceeds to live a lavish lifestyle and pay themselves back for monies invested.  Rappaport and Popky transferred funds into Trust Accounts and siphoned other

funds off into the Lifestyle Spa; the enterprises of Vicky Rappaport.  There was also a transfer of the real property into a related company controlled by Rappaport, Popky and related cohorts.  This transfer was at a time when they knew they were going to defraud creditors.  The former Chief Operating Officer of Lifestyle, Fuoco, had provided information that the transfer was set up to avoid creditors.

102.    With the help of Co-Defendants', including Halbreiner's participation, the cohorts Defendants were successful in enabling a fraud to be committed.  Halbreiner was a key and essential component of the fraud.  Halbreiner's status as an "insider" at Customers enabled the fraud to be committed.

103.    Each of the Defendants, individually and collectively, through their actions and unlawful inaction and concealment, enabled the fraud to be committed and for Customers to suffer a substantial financial loss.  Had any of the Defendants timely disclosed the fraud and misrepresentations by Co-Defendants, the unlawful actions that were being committed, and the fraud could have been avoided and Customers would have been protected.

104.    On August 28, 2013, Metro via Rappaport, forwarded the standby letter of credit created to Customers, which was relied upon.  In fact, the standby letter of credit was worthless, counterfeit or otherwise non-negotiable.

105.    On July 21, 2015, Customers attempted to redeem the standby letter of credit at TD Bank and was immediately advised that the standby letter of credit would not be honored as a result of being a fictitious and/or counterfeit document.  Specifically, at that juncture, Customers was advised that the standby letter of credit was worthless.

106.    Customers has lost approximately $9.0 million dollars.  As set forth previously, there was a prior document issued under the name of Deutsche Bank, which was also worthless.  Halbreiner was aware of the prior Deutsche Bank SBLOC.

107.    Customers received a series of emails and other related communication which were false and misleading.

108.    There were several significant "features" of these ongoing emails and communications from Rappaport and the other cohorts to Halbreiner and vice-versa.  Specifically, there were numerous false statements including the SBLOC.

## CONTINUED DECEPTION

109.    Part of the method of which the fraud was conducted was to prevent Customers from investigating and ascertaining the truth.  The SBLOC would have essentially been cash collateral. Halbreiner knew that the cash collateral was a requirement of a $9.0 million dollar loan.  Halbreiner knew that despite the fact of having a long relationship with Rappaport, that he essentially had no funding sources.  Halbreiner knew that Rappaport had a history of deceptive practices.  Halbreiner knew that a SBLOC required that the principals have substantial assets to support the $9.0 million dollar draw down on the SBLOC in the event of default under the loan agreements.

110.    Halbreiner knew that Customers' outside counsel, Hill Wallack, had specifically raised red flags and concerns about the Deutsche Bank's SBLOC.

111.    Not only did Rappaport, Halbreiner and Popky help commit the fraud they knowingly acted to prevent Customers from discovering the deception by continuing to indicate that there was a legitimate SBLOC issued by Metro a fraudulent enterprise.

112.    While there are civil and criminal laws prohibiting fraud, deception and forgery; Rappaport and his cohorts including Popky and Halbreiner believed these laws were rarely enforced and easily evaded.  Metro and Santiago have had extensive dealings and use of other fraudulent documents to lie to other victims and defraud the public and these Defendants will continue to do so unless prompt immediate and substantial law enforcement action is taken.

113.     Defendants believe that their skill in perpetrating fraudulent schemes, ability to hide funds and willingness to provide false provisions of what occurred will enable them to escape punishment.

114.     Defendants, Santiago and Kohl received a copy of communication that they had reason to know that Customers would provide funding in excess of $9.0 million dollars for the fraudulent and worthless standby letter of credit and their continued communication would prevent discovery of the fraud wherein that timely intervention could prevent the fraud or help recover all or part of the monies taken.  O July 21, 2015, Customers uncovered the fraud.  Halbreiner attempted to delay the scheme by indicating that Rappaport was in fact "not a crook".  Subsequent investigation into Halbreiner's email and other electronic communications told a far different story and indicated that Halbreiner's actions, inactions and fiduciary responsibility to her employer, Customers Bank, had been breached and compromised.  Further, Halbreiner's assistance and collusion in this scheme created a loss of over $9.0 million dollars.  Halbreiner's communications, email communications, wire transfers and attempts to shield the Defendants, Rappaport, Popky and Vicky Rappaport was done deliberately to hinder discovery of this fraud. Following the statement by Fuoco that Halbreiner was paid, the full background of the scheme was uncovered.

115.     Customers was under the impression furthered by Halbreiner and other Defendants that this was a legitimate transaction and development project.  At the bottom was a fraudulent standby letter of credit which Customers had no knowledge of.  They lacked the knowledge because Halbreiner continued to scheme to defraud and failed to disclose to her employer the fraudulent conduct.

116.     Metro has not been satisfied with simply defrauding Customers out of $9.0 million dollars but have conducted other frauds and schemes to further cheat individuals.

## APPLICABLE STATUTES

117.    18 U.S. Code § 1962(c) makes it unlawful for "any person employed by or associated with an enterprise engaged in or the activity of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt."

118.    18 U.S. Code § 1964(c) creates a private right of action for any person injured in his business or property by reason of violation of  § 1962 and provides for threefold the damages sustained as a result of recovery for the cost of suit including reasonable attorney fees.

119.    As described in the Complaint, Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity at the effective date of RICO and also within 10 years of each individual act, specifically, Defendants' actions described violate the following provisions:

120.    The federal wire fraud statute 18 U.S. Code § 1343, which is identified by 18 U.S. Code § 1961 (1)(A) as indictable predicate act for purposes of racketeering.  It provides in relevant part, "Whoever having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals pictures or sounds for the purpose of executing such scheme or artifice shall be fined under this title and imprisoned not more for 20 years or both.

121.    At various times and places enumerated in plaintiff's exhibits all defendants did acquire and retain directly or indirectly an interest in or control of a RICO Enterprises of individuals who were

associated in fact and who did engage in and those activities did affect interstate and foreign

commerce all a violation of 18 U.S. Codes §§ 1961(4), (5) - 1962(b).

122.    During the pertinent time, all Defendants did cooperate jointly and severally in the

commission of two or more of the RICO predicate acts that are itemized in the RICO Laws 18 U.S.

Code § 1961(1)(A), and did so in violation of RICO Law 18 U.S. Codes §§ 1962(b) - 1343.

123.    The federal mail fraud statute 18 U.S. Code § 1341 which is identified by 18 U.S. Code

§ 1961 is an indictable predicate act for purposes of racketeering provides:

> "Whoever having devised or intended to devise any scheme or artifice to the fraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security or other article, or anything represented to be or itimated or held out for such counterfeit or spurious article for the purpose of executing such scheme or artifice or attempting so to do, places any post office or authorized depository for mail matter, a matter or thing whenever to be sent or delivered by the postal service, or deposited or caused to be deposited a matter or thing whatever to be sent or delivered by any private or commercial interstate carrier or takes or receives therefrom any such matter or thing or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing shall be fined under this title or imprisoned not more than 20 years or both." 18 U.S. Code § 1341

124.    Plaintiff is informed and believes that each member of the enterprise played a role and

acted in a mutual reliance on the common purse of obtaining, transmitting, billing and/or collecting

fraudulent monies from the plaintiff customers and engaging in other illegal acts.

## THE PATTERN OF RACKETEERING

125.    The underlying document note and standby letter of credit however characterized by Defendants was essentially worthless.  The transaction was unfair and unconscionable.

126.    Within the past three (3) years, Defendants have knowingly, intentionally and are recklessly engaged in an ongoing pattern of racketeering activity under 18 U.S. Code § 1960(c) by committing the predicate acts of wire mail fraud by knowingly and intentionally implementing a scheme to deceive Customers and others.

127.    Defendants having devised or intended to devise a scheme or artifice to defraud Customers for the purpose of executing such scheme or artifice in attempting to do so, placed or knowingly caused to be placed in a post office or authorized depository for mail matter documents or packages to be sent or delivered by the postal service or private or commercial interstate carrier and received from these entities such documents.

128.    The interstate commerce requirement of a RICO claim is satisfied here because the racketeering claims alleged in this Complaint arise out of, and are based on defendants' use of the Internet and agreements with entities in other states in conjunction with the process of obtaining, transmitting, billing and collecting fraudulent monies in furtherance of the racketeering scheme as alleged in the Complaint.

129.    The pattern of racketeering activity described in this Complaint is continuous, ongoing and will continue unless Defendants are enjoined from continuing these racketeering activities.  Injury to plaintiff, Customers and their business or property from the pattern of racketeering activity.

130.    Under 18 U.S. Code § 1962(a) it shall be unlawful for any person who has received any income derived, directly or indirectly from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of 18 U.S.

Code § 2 to use or invest, directly or indirectly any part of such income where the proceeds of such income in acquisition of any interest in, or the establishment of operation of, any enterprise which is engaged in or the activities which affect interstate or foreign commerce.  Under 18 U.S. Code § 1962(c) it shall be unlawful for any person employed by or associated with any enterprise engaged in or the activities of which affect interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprises are fair through a pattern of racketeering activity or collection of unlawful debt.  Racketeering as defined by § 1961, includes mail fraud.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)      An award of counsel fees, costs and interest

c)      Punitive damages against Defendants

d)      Grant such other relief as appropriate in this matter.

## COUNT TWO

### CONSPIRACY AS TO HALBREINER, RAPPAPORT, POPKY, VICKY RAPPAPORT, MUCK, METRO, SANTIAGO AND KOHL

131.    Plaintiff repeats each of the allegations contained in Paragraphs 1 through 130 as if set forth herein at length.  Defendants, Halbreiner, Rappaport, Popky, Vicky Rappaport, Muck, Metro, Santiago and Kohl have conspired among themselves to violate the laws cited above, commit fraud and deceive Customers through a series and pattern of conduct as outlined above.

132.    Defendants acted in concert with one another in deceiving and defrauding plaintiff. Each knew or should have known that the others' conduct constituted a breach of duty and provided assistance to accomplish tortuous unlawful result.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)      An award of counsel fees, costs and interest

c)      Punitive damages against Defendants

d)      Grant such other relief as appropriate in this matter.

## COUNT THREE

### NEGLIGENCE AND NEGLIGENT
### COMMUNICATION AS TO ALL DEFENDANTS

133.    Plaintiff repeats each of the allegations in Paragraphs 1 through 132 as if set forth herein at length.

134.    Each of the Defendants communicated or helped communicate or facilitated communication of false, deceptive or materially misleading statements in the commission of fraudulent illegal acts which damaged plaintiff.

135.    To the extent that Defendants who were involved in this transaction had reason to know of the false or fraudulent conduct and had duty to disclose same rather than through the actions or actions of facilitated fraud and deception.  To the extent that each Defendant had acted negligently such negligence was a proximate cause of plaintiff's loss and is liable responsible for same.

WHEREFORE, Customers requests that this Court:

a)    Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)    An award of counsel fees, costs and interest

c)    Punitive damages against Defendants

d)    Grant such other relief as appropriate in this matter.

## COUNT FOUR

## BREACH OF FIDUCIARY RESPONSIBILITY AS TO HALBREINER

136.     Plaintiff repeats each of the allegations contained above as if set forth herein at length from Paragraphs 1 through 135.

137.     By virtue of her capacity as a loan officer at Customers Bank, Elizabeth "Bonnie" Halbreiner breached her fiduciary responsibility to Customers.  Halbreiner knew or should have known that the actions, inactions and the fraudulent standby letter of credit as well as the underlying transaction that led to it would breach her fiduciary responsibility to Customers resulting in a loss in excess of $9.0 million dollars.

138.     Halbreiner failed to disclose that there was subsequent funding in place from Kennedy Funding.  Halbreiner failed to disclose and immediately identify that this loan was deceptive on its face especially after she received the Deutsche Bank standby letter of credit.

139.     Halbreiner consistently communicated to Rappaport concerning various aspects of this transaction which but for the fact that she had breached her fiduciary responsibility has caused substantial harm to the plaintiff.

WHEREFORE, Customers requests that this Court:

a)     Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)     An award of counsel fees, costs and interest

c)     Punitive damages against Defendants

d)     Grant such other relief as appropriate in this matter.

## COUNT FIVE

### VIOLATION OF PENNSYLVANIA UNIFORM FRAUDULENT TRANSFER ACT (PUFTA) 12 Pa.C.S.A. § 5104

140.    Plaintiff hereby repeats and realleges Paragraph 1 through 139 and are incorporated herein.

141.    Lifestyle Health Care Group Incorporated is the Defendant and borrower of Customers. Lifestyle Real Estate I, LP is a limited partnership which was the beneficiary and recipient of real property located at 1 New Road, Bensalem, Pennsylvania, also known as tax map parcel 2-001-036.

142.    On July 19, 2013, Customers extended a loan in the amount of $9.0 million dollars to Defendant, Lifestyle Health Care Group Inc. "LHG".  The extension of the loan was for the development of real property in Bensalem, PA.  The loan was funded on August 29, 2013.

143.    Subsequent to funding and upon information and belief, the Defendant, LHG transferred real property into the name Lifestyle Real Estate I LP.  The purpose of this was to avoid creditors as disclosed by Fuoco.  The transfer was done in order to hinder creditors and to defraud Customers.  There was no consideration paid for the transfer.  Further, LHG is essentially an insolvent corporation controlled by Rappaport, Vicky Rappaport, Popky and unknown individuals 1-5 and/or unknown corporations 1-5.

144.    At the time of the transfer, LHG was insolvent and incapable of creating an income. Upon information and belief, the sole reason for the transfer was to hinder creditors in particular Customers.  Subsequently, Defendants Popky, Rappaport, and Vicky Rappaport encumbered the property with additional credit and obtain additional financing in the amount of approximately $3.5 million dollars.

145.    All transfers were made at a time when obligations were owed to Customers.

146.    The transfers made by the owners and controlling individuals behind the transfer Rappaport, Popky and Vicky Rappaport were transfers made to hinder, delay and defraud Customers and to preserve property for Rappaport, Popky and Vicky Rappaport's own use and benefit.

147.    As a result of the transfer; Popky, Rappaport and Vicky Rappaport maintained possession or control of the assets through Lifestyle Real Estate.

148.    Further, Halbreiner knew about this transfer and/or failed to investigate and inform senior management of Customers about the transfer.  As a result of the transfer, essentially the loan was unsecured as a result of the fraudulent counterfeit standby letter of credit there was absolutely no security and protection of Customers.

149.    Before the transfers were made, it appears that LHG was insolvent.  The transfers were essentially made of all the assets of LHG.

150.    The transfer was made to an entity also controlled by Rappaport, Popky and Vicky Rappaport, who were essentially insiders.

151.    The Defendants have in fact hindered, delayed and defrauded the creditor Customers because as a result of the above described transfers, Customers has the inability to satisfy its judgment against the Defendants.  The resulting transfer created great prejudice to Customers.  There is no reasonably equivalent value before the transfer and in essence, the transfer was made without any consideration.

152.    Further, upon information, belief, the remaining assets of LHG are unreasonably small in relation to estimated value of the transfer and are insufficient to satisfy the claims of Customers.

153.    The Defendants intended and believed or reasonably should have believed that as a result of the transfer, the entity controlled by Rappaport, Popky and Vicky Rappaport lacked any ability to pay this debt.  Further, Halbreiner's knowledge of this and acquiescence to this transfer has

substantially injured her employer, Customers.  Upon information and belief, Halbreiner was essentially an insider in the conspiracy to defraud Customers.

154.    These transfers were constructively fraudulent pursuant to 12 Pa.C.S. § 5104(a)(2).

155.    The transfer should be avoided or set aside pursuant to 12 Pa.C.S. § 5107 to the extent necessary to allow Customers to satisfy its claims.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)      An award of counsel fees, costs and interest.

c)      Punitive damages against Defendants.

d)      Grant such other relief as appropriate in this matter.

## COUNT SIX

### VIOLATION OF PENNSYLVANIA UNIFORM FRAUDULENT TRANSFER ACT (PUFTA) 12 Pa.C.S.A §1505 AS TO POPKY, RAPPAPORT AND VICKY RAPPAPORT

161.   The plaintiff hereby repeats and realleges each Paragraph 1 through 160 and are incorporated herein.

162.   Popky, Rappaport and Vicky Rappaport are debtors of Customers by way of the fraudulent conduct and conspiracy to defraud Customers.  Their conspiracy was fostered and assisted and abetted by Halbreiner.

163.   On July 21, 2015 or July 22, 2015, the entity known as LHG which is the alter ego of Popky, Rappaport and Vicky Rappaport breached their obligations under the terms and conditions of the note and obligation.

164.   There was a fraudulent letter of credit which induced Customers to extend $9.0 million dollars.

165.   Rappaport, Popky and Vicky Rappaport have been notified of Customers' discovery of the fraudulent document.  They have taken no steps to satisfy this obligation and have continued their wrongful conduct.

166.   Upon information and belief, Rappaport, Popky and Vicky Rappaport have transferred assets to various entities including Popky's transfer to a trust account and/or trust agreement or trust entity located in California or other locations.  It is unknown as to the exact number of trusts.  Popky's transfer of funds taken from Customers at the time of the loan of approximately $500,000.00 constitutes a fraudulent transfer.

167.   LHG did not receive reasonably equivalent value for the transfer.  As a result Popky's and other individuals' transfer of assets the corporation is essentially insolvent.

168.    The transfers were made by Popky and Rappaport when LHG was insolvent.

169.    These actions constitute violations of PUFTA, 12 Pa.C.S.A. §5105.

170.    These transfers should be void or otherwise set aside pursuant to PUFTA, 12 Pa.C.S.A.

§5107, to the extent necessary to allow Customers to satisfy his claims.

WHEREFORE, Customers requests that this Court:

a)    Enter judgment against the Defendants for compensatory consequential damages and

any relief the Court deems just and equitable.

b)    An award of counsel fees, costs and interest

c)    Punitive damages against Defendants

d)    Grant such other relief as appropriate in this matter.

## COUNT SEVEN

### LEGAL AND EQUITABLE FRAUD
### AS TO RAPPAPORT; POPKY;
### VICKY RAPPAPORT; SANTIAGO AND KOHL

171.     Plaintiff realleges each of the allegations as set forth in Paragraphs 1 through 170 as if set forth herein.

172.     Defendants provided Plaintiff with willfully and maliciously misleading documents including a fraudulent and/or deceptive standby letter of credit as well as other loan documents and business documents.  The Defendants had a duty to disclose information to Customers.

173.     Further, there was a series of communication fostered by the Defendants, along with Halbreiner's communication and failure to investigate the Defendants.

174.     These documents of communication constitute fraudulent and false representations and bank fraud.  Defendants knew that these representations were false at the time when they provided them to Plaintiff and did so with the intention that Plaintiff will rely upon them in deciding to transfer and extend credit in the amount of $9.0 million dollars.  The Defendants knew that the standby letter of credit was fraudulent and in other ways misleading.

175.     Defendants knowingly made the fraudulent misrepresentations and omissions as described above with the intention that Plaintiff rely upon the fraudulent representations and admissions submitted to Customers.

176.     Plaintiff relied upon Defendants' false and deceptive misrepresentations and omissions when deciding to extend credit in the amount of $9.0 million dollars to Lifestyle which was an insolvent corporation and the alter ego of the various Defendants.

177.     Plaintiffs have been directly and in proximately injured as a result of the defendants fraudulent and misrepresentations and omission of the loss of over $9.0 million dollars.

178.     On August 28, 2013, pursuant to the loan agreement, individuals caused a fraudulent, counterfeit or other unlawful standby letter of credit be sent to Customers via either the U.S. Postal Service, FedEx or other common carrier in order to induce Customers to extend credit in the amount of $9.0 million dollars to Lifestyle.  Upon information and belief, individuals including Halbreiner, along with Rappaport, Vicky Rappaport, and Popky knew that the standby letter of credit was fraudulent and deceptive.

179.     In connection with the standby letter of credit it is believed that as part of the funding of the loan there was delivered by way of wire a transfer fee equal to the ten percent (10%) of the loan amount for the standby letter of credit.  The standby letter of credit was funded by Customers as part of the loan agreement and said funds were transferred via wire and other source to Santiago and Metro.

180.     Under the agreement, Customers as the lending bank provided the wire transfer to Metro pursuant to the agreement.

181.     During this time, Defendants had fraudulently represented to Customers and other representatives at Metro as a prominent and well-established source with a branch office in Oklahoma. However, Santiago, knew that it was a scheme to defraud Customers.  Upon information and belief, Rappaport, along with Halbreiner and Popky knew that said actions and inactions were deceptive.

182.     Metro through its agent and representative, Defendant, Santiago illegally acting as a legitimate bank issued a standby letter of credit thereby fraudulently representing that Metro was a bank and/or other financial institution and legally able to issue such standby letter of credit.  The standby letter of credit in no uncertain terms indicated that Metro provide an SBLOC.  Subsequently, Santiago, in connection with other co-conspirators including Rappaport, Popky and Vicky Rappaport

engaged in fraudulent conduct to deceive and wrongfully misappropriate $9.0 million dollars in Customers' funds.

183.    In reliance upon the fraudulent and other deceptive standby letter of credit Customers provided the $9.0 million dollars to Lifestyle.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)      An award of counsel fees, costs and interest

c)      Punitive damages against Defendants

d)      Grant such other relief as appropriate in this matter.

## COUNT EIGHT

### INJUNCTIVE RELIEF TO RESTRAIN
### LHG; LIFESTYLE REAL ESTATE I, GP, LLC
### AND LIFESTYLE RE, I, LP

184.    Plaintiff hereby realleges each of the counts in Paragraphs 1 through 183 incorporated herein at length.

185.    By virtue of the foregoing, Customers has demonstrated that the Defendants including Popky, Rappaport, Vicky Rappaport and Halbreiner have fraudulently transferred assets in violation of PUFTA.

186.     PUFTA specifically provides for the entry of injunction in favor of a creditor and against both the debtor and any transfers prevent disposition of transferred assets.

187.    As set forth, based upon the fraudulent inducement documents prepared and submitted by the above defendants requires the entry of injunction under the circumstances presented.

188.    Customers has clearly demonstrated a likelihood of a success on the merits and the balance in the equities in favor of the issuance of a junction against all Defendants including but not limited to Rappaport, Popky, Vicky Rappaport and Halbreiner.

189.    Granting an injunction in favor of Customers will not result in any greater harm to the Defendants.

190.    Granting a preliminary injunction in favor of Customers is in the public interest.

WHEREFORE, Customers respectfully requests that a preliminary injunction issue immediately joining the Defendants, Rappaport, Vicky Rappaport, Popky, Halbreiner and Santiago directly or in indirectly whether alone or in concert with others including any officer, agent, employee and/or representative therefrom including Lifestyle Healthcare Group; LHG; Lifestyle Real Estate I, GP, LLC and Lifestyle RE, I, LP from further disposition of the assets.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)      An award of counsel fees, costs and interest

c)      Punitive damages against Defendants

d)      Grant such other relief as appropriate in this matter.

## COUNT NINE

### CIVIL CONSPIRACY AGAINST HALBREINER; RAPPAPORT; POPKY; VICKY RAPPAPORT; SANTIAGO AND KOHL

192.     Plaintiff realleges each count previously set forth in Paragraphs 1 through 191 as if set forth above herein at length.

193.     Defendants, Rappaport, Vicky Rappaport, Popky, Halbreiner, Santiago, Kohl and other John Does 1 through 20 conspired to scheme and engage in illegal and unlawful acts including the acquiescence and/or submission of a counterfeit and/or fraudulent standby letter of credit to Customers.  The Defendants accomplished this by clandestine actions and interactions including working in consort to devise a scheme to allow Customers Bank to fund $9.0 million dollars on worthless collateral.  Upon information and belief, the Defendants intentionally misled Customers with the false and misleading standby letter of credit, including the submission of various communications including business plan and investor documentation which they knew Customers would rely upon.  Further, Halbreiner, a loan officer with Customers Bank, assisted in the conspiracy to defraud Customers by breaching her fiduciary responsibility failing to safeguard her responsibilities to Customers.  Halbreiner along with Rappaport and other individuals conspired to defraud Plaintiff, Customers Bank.

194.     Throughout the process, Defendants devised schemes whereby the $9.0 million dollars in addition to other security which was provided to third parties in real property had amassed approximately $12 million dollars.  Upon information and belief, of the approximately $12 million dollars, an estimated half of those funds went to the personal use of the Defendant individuals for related corporations including Vicky Rappaport's 'Spa'.  Upon information and belief, the Spa service was supported by funds from Customers.  At no time did Customers agree to allow their loan funds to

be siphoned and dissipated to a third-party entity - Lifestyle Spa.  Upon information and belief, these actions were deliberate attempts to defraud Customers.

195.     Upon information and belief, Rappaport has had a long lengthy history of defrauding third parties in business ventures and transactions.  The Defendants engaged in legal and elicit communication including transfer of communication via email, written mail and other common carriers.

196.     As a direct result of the acts of civil conspiracy, Customers has been directly and indirectly damaged and sustained substantial losses.

WHEREFORE, Customers requests that this Court:

a)     Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)     An award of counsel fees, costs and interest

c)     Punitive damages against Defendants

d)     Grant such other relief as appropriate in this matter.

## <u>COUNT TEN</u>

### CONVERSION AGAINST RAPPAPORT; POPKY; VICKY RAPPAPORT AND HALBREINER

197.    Plaintiff hereby realleges each of the above Paragraphs 1 through 196 as if set forth herein at length.

198.    Defendants, Rappaport, Popky, Vicky Rappaport and Halbreiner unlawfully exercised dominion and control over the $9.0 million dollars and illegally transferred various amounts to other entities including third party corporations into limited liability companies.

199.    These included the unlawful funding of $9.0 million dollars from Customers.

200.    These transfers were made to Lifestyle I, LP also known as The Spa; Lifestyle Healthcare Group Healthcare; Lifestyle Management Group LLC, and Management Entity.

201.    Transfers made to Life Style I, LP from the period of 2012 to 2015 were in the amount of $226,891.00.

202.    During that same period, Lifestyle Healthcare Group Healthcare received $2.937549.27.

203.    Lifestyle Management Group LLC received $811,948.85.

204.    There were additional funds paid to Advanced Lifestyle I, LP.

205.    Further transfers incurred included a loan repayment to Popky in the amount of $350,000.00.  This loan repayment was made at a time when Lifestyle Healthcare Group was in fact insolvent.

206.    There were additional funds that were transferred concerning land purchase in the amount of $2.5 million dollars.  This appears to be the same land that was encumbered with Kennedy Funding from New Jersey.

207.     The parties have engaged in a systematic conversion of funds from Customers, which were allegedly loan proceeds.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)      An award of counsel fees, costs and interest

c)      Punitive damages against Defendants

d)      Grant such other relief as appropriate in this matter.

## COUNT ELEVEN

**BREACH OF CONTRACT AS TO
LIFESTYLE HEALTHCARE GROUP, INC.**

208.    Plaintiff hereby realleges each of the above Paragraphs 1 through 207 as if set forth herein at length.

209.    Life Style Healthcare Group Inc., "LHG" entered into a loan agreement with Customers.  The Defendant, LHG has defaulted on said obligation.

210.    As part of the loan agreement, the Defendant, Lifestyle Healthcare Group, Inc. was obligated to provide a standby letter of credit.  Upon default, Customers attempted to execute and receive payment under the standby letter of credit terms and conditions.

211.    The letter of credit was not honored and was believed to be fraudulent and/or counterfeit.  As you know from the actions and inactions of the Defendant, Lifestyle Healthcare Group Inc., the Defendant has breached its contract.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)      An award of counsel fees, costs and interest

c)      Punitive damages against Defendants

d)      Grant such other relief as appropriate in this matter.

## COUNT TWELVE

### BREACH OF FIDUCIARY RESPONSIBILITY
### AS TO HALBREINER

212.    Plaintiff hereby incorporates each of the allegations of Paragraphs 1 through 211 as if set forth herein at length.

213.    Defendant, Halbreiner was employed as a Senior Lender for Customers.  As part of her compensation, she was entitled to receive a bonus and related compensatory payments based upon loan generation and related performance criteria.

214.    Subsequent to the breach of fiduciary responsibility and the failure and default of the Lifestyle loan obligation, Halbreiner defaulted on her obligation and accordingly, as to that aspect is obligated to repay any and all funds to Customers for compensatory consequence-related damages.

WHEREFORE, Customers requests that this Court:

a)    Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)    An award of counsel fees, costs and interest

c)    Punitive damages against Defendants

d)    Grant such other relief as appropriate in this matter.

## COUNT THIRTEEN

## ALTER EGO AND VEIL PIERCING

215.    Plaintiff hereby incorporates each of the allegations of Paragraphs 1 through 214 as if set forth herein at length.

216.    Upon information and belief, each of the defendants including Rappaport, Popky, Vicky Rappaport, and Muck controlled and dominated the various insolvent corporations, including but not limited to Lifestyle Healthcare Group, Inc., a Delaware Corporation,   Lifestyle RE, I, LP, Lifestyle Real Estate I, GP, LLC.

217.    The corporations had no real business, no income, were insolvent and the individuals purportedly operating them, they may be mere instrumentalities of the individuals running them.  The corporations were the alter ego of the individuals who had defrauded Customers Bank of $9,000,000.00.

218.    Further, the Defendants, individually Rappaport; The Trust, also known as The Popky Trust; Vicky Rappaport, and Muck made various misrepresentations to Customers and their conspiracy was facilitated and aided by Halbreiner, who received payments or other compensation as a result of her illicit activities in orchestrating her assistance to Defendants.

219.    Upon information and belief, Muck was in charge of the website design and said website was used to elicit other investors and Customers in order to create Lifestyle as a viable entity. Upon information and belief, the corporation was insolvent, and never had any real capabilities of continuing.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages and any relief the Court deems just and equitable.

b)   An award of counsel fees, costs and interest

c)   Punitive damages against Defendants

d)   Grant such other relief as appropriate in this matter.

SALDUTTI LAW GROUP

Dated: November 13, 2015          BY:   ROBERT L. SALDUTTI, ESQUIRE (RS5492)
                                                    BRIAN J. SCHAFFER, ESQUIRE (BS1883)
                                                    ROBERT LIEBER, JR., ESQUIRE (RL3334)
                                                    BNY Mellon Center
                                                    1735 Market Street, Suite 3750
                                                    Philadelphia, PA 19103
                                                    (610) 994-1137
                                                    (610) 200-6272 FAX