**Page 34**

1  A. Yes. I found that very unusual. Maybe
2  the money came in on a Wednesday. That weekend
3  after the money came in, that following Monday,
4  Fred had a brand new car in the parking lot. And
5  I was shocked.
6  And he said to me -- well, no, no,
7  no. He said the guy who owned the dealership
8  called him and said that he could turn his car in
9  now and get a new car. And I said that's kind of
10 unusual, but I took it at face value, and I'm
11 saying all right, well, that was fine. So the
12 guy got a leased car and whatever.
13 I later found out that, you know,
14 the company was paying for his car and his wife's
15 car.
16 Q. What's his wife's name?
17 A. Victoria or Vicky Rappaport.
18 Q. So continuing on, you get the funding.
19 Did you have a conversation concerning payments
20 made to Bonnie?
21 A. Yes. In the context of what I said
22 before, I said to Fred, I guess I remember
23 sitting in his office and I said to him --
24 because I thought that Bonnie really extended
25 herself. I mean she was on the phone with the

KATHY BOWE COURT REPORTERS

**Page 35**

1  provider. She spent a lot of time. You know,
2  she seemed to be advocating for getting this
3  done.
4  And I said to him, I said, you
5  know, are we taking care of Bonnie. And he said
6  yes. And I didn't ask, you know, what or what it
7  was, was it a dinner. I mean I don't know.
8  So in fairness to the answer to the
9  question, I didn't really probe into what that
10 was.
11 Q. Do you have any doubt that there was a
12 monetary compensation to Bonnie?
13 A. In my opinion, the answer would be no.
14 But I couldn't prove that she got money. But in
15 my opinion, it would be that -- any time -- it
16 has just been my history in having been involved
17 in different kinds of transactions, when you use
18 the words are you taking care, or is that person
19 getting taken care of, it always means money. It
20 doesn't mean a pat on the back. It doesn't mean
21 anything else other than money.
22 MR. SALDUTTI: Off the record.
23 (Discussion off the record.)
24 BY MR. SALDUTTI:
25 Q. Mike, did you consider that a kickback

KATHY BOWE COURT REPORTERS

**Page 36**

1  to Bonnie?
2  A. Yes.
3  MR. SALDUTTI: Can we take a break?
4  (Recess taken.)
5  BY MR. SALDUTTI:
6  Q. Mike, when you joined Lifestyle, did
7  they have any revenue?
8  A. No.
9  Q. Did they have any infrastructure?
10 A. No.
11 Q. In the absence of you and your
12 expertise, did they have any ability, did Fred
13 Rappaport or George Popky have any ability to
14 complete a project of this magnitude?
15 A. No.
16 Q. Okay.
17 MR. SALDUTTI: Off the record.
18 (Discussion off the record.)
19 BY MR. SALDUTTI:
20 Q. Mike, the property that was the center
21 or the location of the project was in Bensalem?
22 A. Yes.
23 Q. We've learned that that property was
24 placed in the name of a different Lifestyle
25 entity.

KATHY BOWE COURT REPORTERS

**Page 37**

1  A. Yes.
2  Q. Would you agree that that property was
3  placed in that name of a different entity to make
4  the project judgment proof?
5  A. Yes.
6  Q. Would you agree that that transfer of
7  that property, transfer or that property being
8  placed in the name of a different entity, was an
9  attempt to avoid creditor claims?
10 A. Yes.
11 Q. Stepping back, did you ever learn or
12 come to realize that of the nine million dollar
13 loan that was from Customers, funds were being
14 diverted to other Rappaport and Popky businesses?
15 A. Yes.
16 Q. What were the names of those entities?
17 A. Lifestyle Healthcare Spa. It had the
18 name, but Lifestyle had no ownership of that. It
19 was not part of the company structure. It was a
20 free independent operating company.
21 Q. Who owned that?
22 A. It was my understanding that Vicky
23 Rappaport was one of the owners of that.
24 Q. And did she or Lifestyle Spa provide any
25 services to Lifestyle Group?

KATHY BOWE COURT REPORTERS