**EXHIBIT "E"**

6

1  that came inside the ambulatory care facility.
2           To put together a, what was called,
3  at the time -- there was a debate about what to
4  call it, but it was the organization of the
5  doctors. Typically, that structure is called an
6  IPA. So for purposes of today, let's call it an
7  IPA. That was the intended -- to do that.
8  Q.    Okay.
9  A.    So also, start to evangelize what the
10  model was. And what that means is to be the
11  person who would be representative of speaking
12  to, whether it be investors, vendors, or whomever
13  that had an interest in the project, to explain
14  to them what we were doing. And that included
15  meetings at Rowan College and everything else.
16           And it was also to bring in the
17  disparate pieces that were needed. There was a
18  whole infrastructure component, which was a
19  management structure, that manages and operates
20  the healthcare facility.
21           I have a lot of relationships and a
22  lot of people, and I put together the
23  organizational chart, and I showed them what we
24  needed and where the operating pieces were, what
25  the reporting of those things were, and then just

KATHY BOWE COURT REPORTERS

8

1  tangent, but that was one of the key pieces of my
2  suing them. Because what it turned out to be is
3  that they made it seem that my sole purpose was
4  only to get money. That was like the sixth thing
5  on the list of things to do.
6           Because Fred made representations
7  to me, don't worry about it. I've raised
8  millions of dollars. I've funded projects. I
9  had this. I said okay. Well, let me -- I said
10  if you need me to help you, let me know. He said
11  no, okay. That's fine. That's what we'll do.
12           But my main charge were those
13  things that I told you about. It evolved into me
14  getting involved in raising capital because Fred
15  just proved that -- he didn't have, he didn't
16  have the capabilities to do that.
17  Q.    When you say Fred, who do you mean?
18  A.    Fred Rappaport.
19  Q.    Good enough. And before we go too far
20  afield, what was the Lifestyle project? Where
21  was it located, and what was it intended to be?
22  A.    The Lifestyle project was a 200,000
23  square foot outpatient ambulatory care facility
24  with an eight OR surgical center. And then there
25  was an 80-bed inpatient facility that would also

KATHY BOWE COURT REPORTERS

7

1  the subsequent ground up to the top level.
2           I told them that we needed to have
3  an outside board of directors for reporting, for
4  executives to report to the outside board. And
5  also to have a financial, a board of directors
6  that manages the finances of the company.
7           Needless to say, you're talking
8  about collecting government money and premiums or
9  money from insurance companies, which essentially
10  is one in the same, and there's a tremendous
11  amount of accountability that's needed.
12           So it was important to make sure
13  that we had the right legal people. I brought in
14  Fox Rothschild to replace Alice Gosfield. And I
15  started to bring in guys -- like an executive to
16  run the human resources department. And I
17  started reaching out to all the people that I
18  knew that I thought would be interested in this
19  kind of project.
20  Q.    Were you also responsible for arranging
21  financing or attempting that?
22  A.    Well, that was a part of it. It didn't
23  start out. It kind of migrated to that.
24           That's one of the things I wanted
25  to clarify. And I don't want to go off into a

KATHY BOWE COURT REPORTERS

9

1  be on -- that was about an 85,000 square foot.
2           So the total was something less
3  than 300,000 square foot medical mall, so to
4  speak. That would be the model, because that was
5  kind of what we're trying to emulate. That was
6  located in Bucks County, Pennsylvania. It was
7  where the old police barracks were, right behind
8  the Neshaminy Mall. And I believe that's Bucks
9  County.
10  Q.    And who was in charge?
11  A.    Of?
12  Q.    The project? Who was the president,
13  CEO?
14  A.    Oh, okay. The CEO and chairman, which
15  always puzzled me, because you can't be both, was
16  Fred Rappaport. George Popky, didn't really want
17  a title. You know, I said for the purposes of
18  funding, we need to make you the CMO, because you
19  can't run this without a CMO.
20  Q.    What is a CMO?
21  A.    Chief medical officer.
22  Q.    Okay.
23  A.    So he said, well, no, I want to be the
24  executive vice-president. I said, well, you can
25  be the executive vice-president and the CMO. You

KATHY BOWE COURT REPORTERS

10

1  can wear two hats. I said we're not going to be
2  able to do this without you being the CMO.
3              So he grudgingly agreed to be the
4  CMO.
5    Q.    What was your understanding of Dr.
6  George Popky's involvement as financially?
7    A.    The way it was explained to me -- and I
8  got two different stories. I got one story from
9  Fred and one story from George.
10             Fred made the representation that
11  he and George pooled their money together and
12  they created Lifestyle, I think it was maybe two
13  or three years previous to me knowing them. And
14  that they co-funded it. He and George signed for
15  two loans; one with Customers Bank and one with
16  another bank. And that they set out to go to the
17  doctor community and bring them in as investors.
18             George told me that he put in all
19  the money; that all the loans that were signed
20  for were pretty much him taking the risk because
21  Fred had, at the time I think he was coming off
22  of either two or three bankruptcies. So I
23  wouldn't think anybody would lend him money.
24             So it would seem to me, just with
25  that basis of information, that George Popky was

KATHY BOWE COURT REPORTERS

11

1  responsible.
2              He and Fred may have signed the
3  loan documents together, but it would be my
4  opinion that if you took a look at that, that
5  George Popky would be the main guy that people
6  would be leaning on. I mean, they did it based
7  on his credit and his financial wherewithal at
8  the time.
9    Q.    Let's talk about the Customers loan.
10  Tell me your understanding of how it evolved and
11  what happened.
12    A.    Okay. About approximately
13  three-and-a-half years ago, I met with, as I said
14  to you earlier, I met with Fred and I met with
15  George in a restaurant. The subsequent
16  conversations were about finding a standby letter
17  of credit.
18             But before that happened -- and I'm
19  not doing this in the right order, Fred sent me a
20  couple of term sheets from Customers Bank. One
21  for seven-and-a-half million, one for eight
22  million. I mean there were different numbers.
23  But they were somewhere between seven-and-a-half
24  and nine million dollars. They varied every time
25  I saw the term sheet.

KATHY BOWE COURT REPORTERS

12

1              But the one thing that ran true and
2  was consistent at all times was the only way the
3  bank would do it, because Bonnie had told me, I
4  think on one time, that she couldn't get anything
5  more out of -- Fred had no credit and George had
6  run his limit in terms of what she would allow
7  them to borrow. And they couldn't borrow any
8  more money.
9    Q.    Before we get to -- who is Bonnie?
10    A.    Bonnie Halburten, Halburthen (sic), I
11  think that's how you pronounce her last name.
12  She represented herself as an executive at
13  Customers Bank.
14    Q.    And what did Bonnie tell you concerning
15  Fred Rappaport's credit?
16    A.    That he had bad credit and that the only
17  way loans -- a loan would be made is if George
18  were on the -- George was one of the signers.
19  And I believe he signed on every note that
20  they -- any money that they had gotten from any
21  banks was a result of George signing for them.
22    Q.    Okay. And then what happens next
23  concerning -- take me through what happened with
24  this letter of credit or standby letter of
25  credit?

KATHY BOWE COURT REPORTERS

13

1    A.    Yeah. It was like a six or eight
2  month -- approximately six to eight months to get
3  this thing. And it started with Fred telling me
4  that, that he knew of or had people that he had
5  that could do standby letters of credit.
6              And then George would tell me that
7  Fred doesn't -- that's not really accurate
8  because Fred doesn't even know what a standby
9  letter of credit was.
10             So I said all right. Well, let's
11  forget about all that, who knows what. What is
12  it that you want me to do.
13             So what I did over that period of
14  time was to identify and qualify providers of
15  standby letters of credit. You know, we went
16  through a bunch of them that were, you know, they
17  weren't really legitimate and so forth and so on.
18    Q.    How do you end up with the standby
19  letter?
20    A.    So at the end of this process, a guy
21  from LinkedIn calls me, and I don't know how he
22  got my name. And he says I understand you're
23  looking for a standby letter of credit. And I
24  said yes, but here is what the parameters of what
25  we're looking.

KATHY BOWE COURT REPORTERS

14

1  **Q.**    What was his name?

2  **A.**    The name of the company was Profane

3  Capital. I don't remember the gentleman's name.

4  **Q.**    Okay.

5  **A.**    And he says to me, listen -- and I said

6  to him before, I said before we get started, I

7  got to tell you that we've been doing this for a

8  long time. We're not going to give you any money

9  upfront. We're not going to pre-pay for any of

10  the fees. And the only way we can do this

11  transaction is if the bank is proactively

12  involved, to the extent that the bank wants the

13  letter written a certain way, the bank wants to

14  be the beneficiary, and the bank wants to have

15  full charge and control over how the letter is

16  issued, where it came from and so on and so

17  forth.

18  **Q.**    At this time, do you know, is it

19  Customers Bank involved?

20  **A.**    Yes. I'm sorry. At this time the

21  bank -- I'm sorry, it was Customers Bank wanted

22  all three of those control pieces.

23          So this guy said I want you to talk

24  to somebody. He's in California. His name is

25  Randall Colt. This guy puts up his own money.

KATHY BOWE COURT REPORTERS

15

1  He's got his own line of credits with banks. He

2  issues standby letters of credit. He's not

3  fraudulent. Let me talk to him.

4          So I talked to him. I explained to

5  him. I said listen, here is what we need. We

6  need a standby letter of credit for

7  nine-and-a-half million dollars against the nine

8  million dollar loan. He said no problem. We

9  can't pay the fees upfront. We can't even pay

10  the fees contingent with getting the letter

11  issued; it has to be verified and authenticated

12  before you get your money. The bank has to

13  verify and authenticate everything. No problem.

14  We won't pay any fees upfront. No problem. We

15  can't escrow the money because we don't have it.

16  No problem.

17          And then what it wound up was there

18  was an account set up that 50,000 dollars was put

19  into it as a show of good faith.

20  **Q.**    By who?

21  **A.**    By George. George put up the money.

22  **Q.**    George Popky?

23  **A.**    George Popky put up the money. It went

24  into a bank account that was controlled by

25  Lifestyle and Metropolitan.

KATHY BOWE COURT REPORTERS

16

1  **Q.**    Who is Metropolitan?

2  **A.**    Metropolitan was the provider of the

3  standby letter of credit.

4  **Q.**    Do you know where they're located?

5  **A.**    I think they could be in Salt Lake City.

6  They're somewhere on the west coast. Because

7  every time there was a call that needed to be

8  made, there was a three-hour time difference.

9          So it could be Salt Lake City, it

10  could be somewhere -- I'd have to go back and I'd

11  have to look it up.

12          So Randy was a nice guy. And I

13  said well, I can't do this. I said I'm a middle

14  man, so to speak. Look, I work for the company,

15  this is what I do. I'm not the signer. I can't

16  get the letter authorized. I can't even pay for

17  it. The only thing I can do is give you the

18  parameters of the deal. Would you be willing to

19  do it. Yes.

20          He said well, who would be the

21  person -- there's something called an -- there's

22  a whole form that you have to fill out which

23  includes your passport, name and so forth, and

24  that's the person that would be getting the

25  standby letter of credit and paying for it. And

KATHY BOWE COURT REPORTERS

17

1  Fred filled out all that paperwork and submitted

2  it to Randy.

3          So at that point, I'm out because I

4  can't sign for anything. And I couldn't

5  follow-up because Randy only wanted to talk to

6  the principals. And that, in this case, would be

7  Fred.

8  **Q.**    Okay. What happened? This gets in

9  play. Walk me through. And what time period are

10  we talking about?

11  **A.**    It would have been approximately July or

12  August, two years ago.

13  **Q.**    So 2013?

14  **A.**    '13. It would have been in that time

15  frame.

16  **Q.**    Okay.

17  **A.**    At that time, if you're talking about

18  the end process, working backwards, is that Randy

19  agreed to all the terms that the bank wanted.

20  That was the language of the standby letter of

21  credit, waiting to get his money and having the

22  bank authenticate that the letter was real.

23  Those were the parameters for payment to him.

24          So he said fine, I'm willing to do

25  all that, as long as the bank will assure me that

KATHY BOWE COURT REPORTERS

30

1  the letter -- I said I thought in the term sheet
2  there should have been that aside from the bank
3  guarantee, that the bank was going to take a
4  first lien position on the property once it was
5  acquired. That would have made more sense to me
6  because then the bank would have had -- was the
7  property worth 5.6 million. I don't know. I'm
8  not an appraiser. All I know is we had an
9  appraisal that said it was worth that much.
10         So if I'm the bank, I'm taking all
11 the collateral I can get. I mean I understand
12 that the bank guarantee is something I can rely
13 on, but I would have looked for some other form
14 of collateral. I would have had some contingency
15 forms of collateral.
16         Those are the deals I've seen.
17 When you have no credit, no money, no assets, and
18 nothing really that the bank can go after if the
19 loan goes south, I've never seen a deal stand on
20 just a standby letter of credit.
21         I said is Popky signing the loan
22 agreement. No, I'm the only one signing it. I
23 said all right. I said that was -- it was just
24 surprising to me that that was how this deal went
25 down.

KATHY BOWE COURT REPORTERS

31

1  Q.     Take me to what happens the day the
2  funding comes through. What do you remember
3  occurring?
4  A.     Obviously, a great deal of happiness
5  that the money was in. That George was relieved
6  that he was going to get his money back because
7  he thought he would never get any of his money
8  back. Fred was happy that he could pay off the
9  loans.
10        I said the first thing we have to
11 do is buy the land. That didn't happen for
12 another 90 days, and I don't know why. And I
13 said we need to set up a budget to start to begin
14 to operate the company. I said we're going to
15 need certain dollars allocated to certain cost
16 centers that we have to -- in order to bring in
17 an investor, we have to show that we've invested
18 in areas that, you know -- there are the soft
19 costs of the projects, both from a real estate
20 perspective and an infrastructure perspective. I
21 said those things have to be in place.
22 Q.     What occurs? What happens to the money
23 immediately?
24 A.     The first thing I see is that the loans
25 all get paid off, and then, obviously, all the

KATHY BOWE COURT REPORTERS

32

1  fees get paid.
2  Q.     When you say the loans get paid off --
3  A.     The loans to Customers Bank and the loan
4  to the other bank. And the fees that were
5  associated with getting the standby letter of
6  credit.
7         I can't tell you factually, but it
8  was my understanding that I thought Fred and
9  George took some additional money. Like Fred,
10 Fred told me that he had spent a lot of money --
11 he had spent a lot of his own money and he put it
12 into the company, and that he was going to take
13 some of that back.
14        And I just said well, you know,
15 what does that look like. And he goes well, I'm
16 running the company. I'm the CEO. Don't worry
17 about it. I mean that was kind of the answer I
18 got.
19        And I said, look, all right. I
20 said at the end of the day, I said if all this
21 is, is a money grab, then let me just get out of
22 here now before the shit hits the fan. Excuse
23 me. And --
24 Q.     What do you mean by money grab?
25 A.     Well, he took something literal. And I

KATHY BOWE COURT REPORTERS

33

1  guess I'll take responsibility for having made
2  the statement.
3         In the ebb and flow of this
4  transaction, that is, the standby letter of
5  credit coming in, and the money coming into the
6  company, I said typically, in an arrangement like
7  this, I said, there's something called
8  shareholder equity, which means that if you put
9  in a half million dollars before the money came
10 in, you have a right to take the money out. If
11 it's in the operating agreement of the company --
12 I never saw the operating agreement.
13        I said to him, you know, you would
14 have a right to do that, I said, but I would
15 recommend against it because we need every nickel
16 that we can get that has to be applied to the
17 project. I said so -- he said, well, no, I'm not
18 doing any of that.
19        But then George had mentioned that,
20 you know, that Fred was, you know, was going to
21 take some money. I don't know if he ever took it
22 or not because I had no access to the books, nor
23 had I had any access to the checking account.
24 Q.     Did Fred get a new car after the loan
25 came in?

KATHY BOWE COURT REPORTERS

46

1  be there with you handing her the letter.  Right.
2  So you could never ever say that you gave her the
3  letter and she never got it.
4            Well, no, that's not necessary.
5  I'll take care of it and I want to call Greg
6  Gosfield.  I want to -- I said I don't care if
7  you call the Pope.  You have to give her the
8  letter.
9            All right, I'll take care of it.
10  Don't worry about it.  I said I am worried about
11  it.  He said, no, don't worry about it.  Okay.
12            So a day goes by, we go out to
13  lunch the next day.  I said I didn't sleep last
14  night.  I said, no money was recalled, I assume
15  you gave the letter to Bonnie.  He said yeah, I
16  did give it to her.
17            And I said well, what was her
18  reaction.  She didn't have one.  Well, how could
19  she not have a reaction.  Essentially, you
20  borrowed money that can't be paid back if this
21  thing -- if we don't get the funding.  Well, I'm
22  not worried because I know we'll get the project
23  funded and this will become a non-issue.
24            I said I don't know if that's the
25  right thinking for where we are.  I said I think

47

1  you need to do something.  I said do you have an
2  attorney that you can consult with.  I said, do
3  you have -- I said, you know -- he said no.  He
4  said listen.  He said here is my take on it and
5  he said George will back me up on this.  That it
6  is not our responsibility.  We did what we said
7  we were going to do.  We gave the bank the
8  letter.  The bank had the obligation to verify
9  it.  They verified it.  We're done.
10            I said no, you're not.  I said how
11  could you be done.  I said you signed the
12  frigging loan agreement.  That means you're
13  obligated no matter what happens.  It doesn't end
14  here.  I said if they call this note, Fred, I
15  said, I said, I'm telling you right now, I'm not
16  going to be here without a chair when the music
17  stops.
18            So he said no, I submitted the
19  letter.  The bank has it.  And I never asked
20  about it again.
21            The only time I asked about it
22  again is, because we were coming up to the
23  12-month mark.  And I said to him, do you want me
24  to call Randy or TD Bank to see if we can renew
25  the letter.  No, I'll take care -- I'll call the

48

1  bank.  I'll take care of it.  And I said it's a
2  half a point.  I said do we have a half million
3  dollars to renew it.  I said because I don't know
4  what we have or don't have.  I have no idea
5  what's in the bank account.  And he said I'll --
6  he said it will get taken care of.  And I said
7  all right.
8            So the 12-month went by, but then
9  he said that he had spoken to Bonnie and she gave
10  him an extension.  An extension for what.  I said
11  it isn't Bonnie.  I said Bonnie can give you all
12  the extensions she wants.  Did the bank renew it
13  for six months.
14  Q.      And you meant TD?
15  A.      TD Bank.  Did TD Bank extend the
16  guarantee.  And I said you could work -- I said
17  you could do something creative.  You could tell
18  Randy, listen, I don't have a half million
19  dollars, but maybe the bank will only charge you
20  half a percent to renew it.  Because it is their
21  standby letter of credit.  I said sometimes the
22  banks are less expensive than going through a
23  third party.  You might want to look into that.
24  Yeah, I will.
25            And then I never asked again.  That

49

1  was -- he told me that he gave it to Bonnie.  And
2  his response to me was always, categorically, and
3  George said the same thing, it's the bank's
4  problem; not ours.
5  Q.      How did you become aware, how did you
6  become aware of the spa's finances?
7  A.      George Popky told me.
8  Q.      What would he say to you?
9  A.      George was an interesting guy.  Very
10  nice man, but he always played both ends against
11  the middle.  So he would call me at night.  And
12  he would say, you got to do something.  I said
13  well, what is it that you want me to do.  You've
14  got to talk to Fred.  You got to tell him to stop
15  doing this.  You need to bring in a chief
16  financial officer that has oversight over the
17  checkbook so Fred just can't write checks for
18  whatever he wants to.
19  Q.      Did he give you details about it?
20  A.      Yes.
21  Q.      What did he say?
22  A.      He said, he told me two alarming things
23  that really were shocking to hear.  One is that,
24  that -- and the thing that precipitated the call
25  is that George -- the company had American

50

1  Express bill that George got on his credit.
2  Because they gave me a card and I didn't use it.
3  I think I used it once. But I wasn't going to
4  use it. I said I've got my own credit card. I
5  said, George, I'm not going to use your credit.
6  But he said no, use it if you need it, and I said
7  okay.
8          But anyhow, he calls me at home and
9  says, I don't know what to do. That was his
10  opening comments to me every time he called me.
11  I don't know what to do. And I said what don't
12  you know what to do. He said Fred is out of
13  control. He went to St. John's. He paid for
14  everybody to go and he bought two expensive
15  watches. And he said I think they were 80,000
16  dollars in total for two; one for him and one for
17  his wife that he put on the company credit card.
18          And I said well, how is he going to
19  pay for it. I said his only source of income is
20  the company. I said is he going to make himself
21  a personal loan to pay the bill to give to
22  American Express. And then how is that accounted
23  for on the books. I said I don't have access to
24  the books. I asked him for access to the account
25  and I asked him for that many times, he said no,

KATHY BOWE COURT REPORTERS

52

1  proceeds?
2  A.      I'm going to say I assume that's what
3  they did. And I later found out that, yeah, the
4  company -- because what they did is they said it
5  was a business trip and because they discussed
6  business, that the company -- the company paid
7  for it. I know that the company paid for it.
8  Because George told me that the company paid for
9  it because he called me again complaining about
10  another American Express bill that had this trip
11  on it.
12  Q.      A different trip?
13  A.      No, the same trip. So there was a bill
14  floating around for American Express, I think for
15  over 100,000 dollars. And American Express is
16  you pay when you get the bill.
17          So what they did --
18  Q.      So your understanding was everyone went
19  down to St. John's?
20  A.      Yes.
21  Q.      And they spent 100,000 dollars?
22  A.      That was my understanding from what
23  George told me about the American Express bill
24  that he got.
25          MR. SALDUTTI: Can we go off the

KATHY BOWE COURT REPORTERS

51

1  I'm not -- I'm in charge of the books.
2          And I said, all right. So George,
3  what is it that you want me to do. He said well,
4  don't ever tell anybody, and if you ever tell
5  Fred, he'd never forgive me.
6          And I said well, here is what you
7  have to do, George. From now on, don't tell me
8  something that you don't want me to repeat to
9  somebody because then you make me a guilty party
10  with you. Because now you're giving me
11  information that I can't do anything with. Now I
12  know something wrong happened and I can't do
13  anything about it. So what is it you want me to
14  do.
15          Well, forget that I told you. And
16  I said how can I forget. I said, you know, the
17  company is going -- we need every nickel we can
18  get our hands on. He decides to go take a
19  vacation for maybe it was a week or two. It was
20  at least a week or maybe it was ten days. And
21  then, you know, and then George is with him.
22          I said so how can you be crying the
23  blues when you're sitting on the beach with him.
24  I said so --
25  Q.      Using Customers money, the loan

KATHY BOWE COURT REPORTERS

53

1  record?
2          (Discussion off the record.)
3          MR. SALDUTTI: Back on the record.
4  BY MR. SALDUTTI:
5  Q.      Mike, tell me the relationship between
6  Bonnie and Fred Rappaport. How often did she
7  come to the office, what did you see when she
8  came to the office?
9  A.      Fred told me that he had a very, very
10  close relationship with Bonnie and had known her
11  for a long time. And that she would come to the
12  office, and sometimes he would say it was a
13  social call because she knew him and they were
14  friends. Sometimes it was business related.
15          But I would say more often than
16  not, you know, she came on a business-related
17  matter, and there were more times than not, they
18  were closed-door conversations.
19  Q.      Did you find that unusual?
20  A.      Yes. Given that the questions that she
21  was answering, I would probably be the only
22  person that had the answers. So -- and the
23  questions that I was asked during those meetings
24  were relevant to when do you think the funding
25  would be done and where are we as far as the

KATHY BOWE COURT REPORTERS

78

1  in one night when I wasn't there because he
2  didn't want me to meet the guy.
3      I said all right. I'm going like,
4  what did he think I was going to do to the guy,
5  attack him. I think I could have helped if we
6  had a meeting. And he said he wanted to talk to
7  the guy by himself. And I don't know what the
8  result of that meeting was.
9  Q.    But you knew that Kennedy put a mortgage
10  on the property?
11  A.    Right. Yes.
12  Q.    Did anyone --
13  A.    And I can send you that letter.
14  Q.    Did anyone ever express concerns that,
15  you know, Customers funded this project --
16  A.    Well, that was the reason why I did it.
17  I said to him, I said here is the reason why I
18  thought we needed the loan. To renew the standby
19  letter of credit so that Customers would continue
20  to have some coverage right on the loan. You
21  guys are still hanging out nine million dollars.
22  It's a cosmetic fix, but at least you had
23  something. Right. You had a document that says,
24  if we -- if we don't pay the loan, you got --
25  you've got something, you've got -- you've got

79

1  something that could possibly make you whole.
2  Q.    How much were you paid?
3  A.    My employment contract was 400,000
4  dollars a year, but I was only drawing down like
5  150,000. I was drawing like one-third of my pay.
6  Q.    How much was Popky getting paid?
7  A.    400, I think 450.
8  Q.    And Rappaport?
9  A.    Maybe a half million.
10  Q.    Okay.
11  A.    And his wife was, he thought that there
12  had to be parity between me and his wife. So he
13  decided he was going to pay her 400,000 dollars a
14  year. And I said what are you going to pay her
15  for.
16      And I said to him just on that
17  subject, and I don't mean to go off on these
18  tangents, but I said to him, how the frig are we
19  going to justify this. I said where does -- how
20  does she get to earn this money. Well, she's in
21  charge of marketing. I said what marketing, man.
22  Q.    Was anybody concerned that the company
23  wasn't generating a dime and everyone was taking
24  out these salaries? I mean was Popky saying if I
25  pull 400 out -- I mean what was your burn rate?

80

1  A.    I'm going to say -- well, you know
2  better than I. I would say 15, 20,000 dollars a
3  month or more. Well, actually it would be more
4  because we're covering the spa.
5      I'm sorry. It is probably closer
6  to 100,000 a month or more than that. Probably
7  more than a hundred thousand a month.
8  Q.    Okay.
9  A.    So the answer to your earlier question,
10  that has always -- that was always my concern.
11  And you know, and George said -- here is exactly
12  one, another piece to the termination thing that
13  caused the blowup for me.
14      George comes to me a week before we
15  have this meeting -- and I'm sorry to be bouncing
16  all over the place. George comes -- a week
17  before I have this meeting with Savya and George
18  that the meeting was -- the conversation was
19  overheard, George comes to me and goes, you
20  better be careful. I said why. He said because
21  Fred is going to blame you for everything. He's
22  going to blame you for not getting the money.
23  He's going to blame you for -- because Fred
24  doesn't know how to take responsibility for
25  anything. So he's going to try to make you the

81

1  fall guy.
2      I said well, I don't know how he
3  would do that. He was involved in every
4  conversation I ever had. He knew everything that
5  I was doing. He knew what the answers were. So
6  what is he going to blame me for. And I said if
7  that's what he wants to do, I said that makes me
8  say I shouldn't be here, because he's not willing
9  to take responsibility for anything, ever, under
10  any circumstances.
11  Q.    So if I do the calculation of Fred is
12  paid a half million dollars, his wife is getting
13  400,000 and his son is getting another hundred
14  thousand, they're pulling a million dollars?
15  A.    Yes.
16  Q.    Plus benefits, plus who knows what --
17  A.    Plus their cars were getting paid by the
18  company.
19  Q.    What kind of cars did they drive?
20  A.    A DMX, four-wheel. Who makes the DMX?
21  Mazda, Honda. It was a black DMX. That was the
22  model of the car. And his wife had some kind of
23  sports car. Maybe it was an Acura sports car.
24  Q.    Was the son's car paid through the
25  business?