SALDUTTI LAW GROUP
Robert L. Saldutti, Esquire (RS5492)
Rebecca K. McDowell, Esquire (RM3223)
BNY Mellon Center
1735 Market Street, Suite 3750
Philadelphia, PA 19103
(610) 994-1137
*Counsel for Plaintiff, Customers Bank*

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CUSTOMERS BANK | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| FRED RAPPAPORT, et. al., | : | DOCKET NO. 2:15-cv-06145-AB |
| | : | |
| Defendants. | : | |

**THIRD AMENDED COMPLAINT**

**I.    PARTIES**

1.    Plaintiff Customers Bank ("Customers") is a state-chartered financial institution headquartered in Wyomissing, Pennsylvania.

2.    Defendant Fred Rappaport ("Rappaport") is an individual and the alleged CEO of Lifestyle Healthcare Group, Inc. Rappaport resides at 2221 Sand Trap Road, Jamison, PA 18929.

3.    Defendant Lifestyle Healthcare Group, Inc. ("LHG") is believed to be a Delaware Corporation believed to conduct business in the Commonwealth of Pennsylvania located at 790 Newtown Yardley Road in Newtown, Pennsylvania and 998 Second Street Pike, Second Floor, Richboro, PA 18954.

4.    LHG was the vehicle used by the Defendants to obtain funding from Customers.

5.    LHG is believed to own 85% of Lifestyle Real Estate, I, LP ("Lifestyle REI"), a Delaware Limited Partnership.

6.      Lifestyle Real Estate, I, GP, LLC ("Lifestyle GP") is believed to own 11% of Lifestyle REI.

7.      The development of the project that is referred to in this lawsuit was to take place at 1-2 New Road, Bensalem, PA.

8.      Defendant Vickie Lee a/k/a Vicky Lee Rappaport ("Vicky") is an individual and the wife of Rappaport and is a principle and/or senior officer of LHG.

9.      Vicky also owned and/or controlled Lifestyle Spa ("Spa").

10.     Vicky resides at 2221 Sand Trap Road, Jamison, PA 18929.

11.     Defendant Spa is believed to be owned and/or controlled by Vicky.

12.     Defendant Lifestyle RE I is a Delaware corporation and limited liability partnership controlling and owning real property in Bucks County, Pennsylvania.

13.     Defendant Lifestyle GP is believed to be a general partnership owing 11% of Lifestyle REI.

14.     Defendant Lifestyle Management Group, LLC ("LMG") is a limited liability corporation owned and/or controlled by LHG.

15.     Defendant Lifestyle Management, LLC ("LM LLC") is located at 790 Newtown-Yardley Road, in Suite 425, Newtown, PA 18940.

16.     Defendant Lifestyle Plastic Surgeon One LP ("Lifestyle SOLP") is a corporation controlled and owned by Rappaport.

17.     Defendant Lifestyle Plastic Surgery Inc. ("Lifestyle Surgery Inc.") is a corporation owned and controlled by Rappaport.

18.     Defendant, George Popky ("Popky") is a medical doctor and resides at 8801 Crefeld Street, Philadelphia, Pennsylvania.

19.     Popky at various times served as the officer and/or other owner of LHG and its related

and affiliated partnerships, corporations and/or LLCs as set forth above (collectively "Lifestyle

Defendants"). Popky, along with Rappaport, controlled and/or operated the various shell corporations.

20.     Defendant Elizabeth Halbreiner, a/k/a Bonnie Halbreiner ("Halbreiner"), was formerly

the Senior Vice President, Regional CLO for Customers and resides at 29 Bedford Lane, Newtown,

PA 18940.

21.     Defendant Metropolitan Financial Holdings LLC a/k/a Metropolitan Bank Corporations

("Metro") is a limited liability company located in 219 SW C Avenue, Lawton, OK 73501.

22.     Defendant, Metropolitan Bancorp LTD a/k/a Metropolitan Capital & Financial, LLC

a/k/a Metropolitan Financial Holdings LTD ("Metro Bancorp") (collectively with Metro referred to as

"Metro Defendants") and Metro are corporations conducting business nationally and internationally.

23.     The Metro Defendants identify their USA branch at 219 SW C Avenue, Lawton, OK

73501; their New Zealand branch as located at 40B Esk Street, Parkvale, Tauranga, New Zealand

3112; and their Panama branch as located at Azuero Business Center, Suite 514, Avenida Perez Chitre,

Panama, 0601-00395.

24.     The Metro Defendants contend they are registered to conduct business and/or are

licensed in Australia, New Zealand and Panama. Metro held itself out as a financial entity with

substantial assets, which was a complete fabrication. Metro used various related names and was the

alter-ego of Defendant Goldie Santiago.

25.     Defendant Randall Kohl ("Kohl") is an individual residing at 7250 Franklin Avenue,

Suite 207, Los Angeles, CA 90045. Kohl is either an agent or affiliate of Metro and is the principal of

Defendant Integrated Energy Group, Inc. d/b/a IEG, LLC ("IEG").

26.     Defendant IEG is a California corporation located at 4000 West Valley Boulevard, Suite 105, Walnut, CA 91789.

27.     Defendant Goldie Santiago a/k/a Goldie Dickey ("Santiago") is an individual residing at 11147 NE Wolf Road, Fletcher, OK 73541 and a controlling member behind Metro.

28.     Defendant, MKKG, Inc., "MKKG" is a corporation conducting business in Lawton, Oklahoma, and is believed to be controlled and/or owned by Santiago and share an identity of interest with Santiago.

29.     Defendant Fiscal Conduit, Inc. ("Fiscal") is believed to be a corporation controlled by Santiago, located at 219 SW C Avenue, Lawton, OK 73501 and share a common identity of interest with Santiago.

30.     Defendant Direct Mortgage Lenders, LLC ("Direct") is believed to be a company controlled by unknown individuals and located at 3617 Highland Avenue, Highland, CA 92346. Upon information and belief, Direct is controlled by Kohl.

31.     Defendant A.T. Financial Services, LLC ("ATF") is believed to be a corporation located at 219 SW C Avenue, Lawton, OK 73501 and the alter-ego of Santiago and/or Defendant Allen Cornelius Dickey ("Dickey")

32.     Defendant Dickey is an individual and believed to be located at 11147 NE Wolf Road, Fletcher, OK 73541. Dickey has held himself out as an officer of Metro.

33.     Defendant Daniel L. Muck ("Muck") is an individual residing at 1614 Tamanend Drive, Quakertown, PA 18951.

34.     Muck is the son of Vicky, and he received substantial payment from the insolvent LHG.

35.     Defendant The Popky Trust ("Popky Trust") is believed to be a trust located at 8801 Crefeld Street, Philadelphia, Pennsylvania. This entity was created by Popky to hinder creditors and to shield assets controlled and operated by Popky.

36.     Defendant The Janet Parker Popky Disclaimer Trust ("Disclaimer Trust") is a trust that owns and/or controls or is a fiduciary of real property located at 8801 Crefeld Street, Philadelphia, Pennsylvania and/or of other assets.

37.     Defendant, Deborah R. Popky ("DRP") is named in her capacity as Trustee of the Disclaimer Trust.

38.     Defendant, Donna H. Popky ("DHP") is named in her capacity as Trustee of the Disclaimer Trust.

39.     Defendant, Jennifer B. Popky ("JBP") is named in her capacity as Trustee of the Disclaimer Trust.

40.     Defendant David Kittka ("Kittka") is named in his capacity as Trustee of the Disclaimer Trust.

41.     John Does 1 through 20 are the unknown individuals who have defrauded Customers and/or assisted other Defendants in defrauding Customers.

42.     John Doe Corporations 1 through 20 are the unknown limited liability companies, corporations, limited partnerships, trust entities, and/or related unknown entities that engaged in conspiracy to defraud Customers or assisted in defrauding Customers.

## II.     JURISDICTION AND VENUE

43.     This Court has subject matter jurisdiction pursuant to provisions of 28 U.S. Code § 331.

More specifically, plaintiff seeks relief under 18 U.S. Code §§ 1961-1968. Therefore

§ 331 vests this Court with subject matter jurisdiction.

44.     The Court's supplemental jurisdiction pursuant to 28 U.S. Code § 1367 is also invoked

to empower the Court to hear claims arising under the statutes in common law of the Commonwealth

of Pennsylvania that form a part of the same case in controversy.

45.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S. Code §

1391 (a) because a substantial part of the events or admissions giving rise to the claim occurred in the

Commonwealth of Pennsylvania and Defendants Rappaport, Halbreiner and Popky, all reside within

the Eastern District of Pennsylvania.

## III.   **PRELIMINARY STATEMENT**

46.     This is an action arising out of Defendants' massive scheme to defraud Customers, a Federally insured financial institution, out of over $9 million. The illegal scheme involved the participation of numerous individuals and entities, including Rappaport, Vicky, Muck, Halbreiner (a former employee of Customers), Santiago, Popky, Kohl and other unknown individuals and/or corporations.

47.     As alleged herein, the defrauding of Customers was the regular way these Defendants worked together, led by Rappaport, and these individuals and their front companies remain at large and a threat to others.

### *THE CUSTOMERS BANK $9 MILLION SCHEME*

48.     The scheme involved obtaining a $9 million loan using a fraudulent and/or counterfeit standby letter of credit ("SBLOC"), then pocket the money.

49.     An SBLOC is a guarantee of payment issued by a bank to a client as collateral on a loan; it is essentially a cash equivalent.

50.     In this case, the SBLOC that was submitted to Customers and arranged by Metro was fraudulent and counterfeit (with the assistance of Halbreiner, who acted in collusion with the other Defendants to help orchestrate the fraud).

51.     Metro has a long and torturous history of deceptive and fraudulent financial crimes throughout the United States and internationally, including other federal cases wherein they have been implicated including *R.B. Development, CO., LTD v. Metropolitan Financial Holdings, LTD, et. al.*, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-01460; and *Payer v. Berrones et. al.,* U.S. District Court of New Jersey, Case No. 1:12-cv-01704-RMB-JS.

52.    Metro contended that with an SBLOC, a business will be deemed "trustworthy" and knew that with the use of a fraudulent SBLOC, the business would obtain credit.

53.    Rappaport has a history of deceptive business dealings involving a similar pattern of conduct, as set forth below.

54.    Rappaport has engaged in a pattern of raising capital from investors, situating himself as president or other executive, siphoning out large salaries and personal expense payments from essentially insolvent companies, as well as the creation of various shell corporations that controlled the underlying investments.

55.    Rappaport, a former used car salesman, continually held himself out as a "Dr." to elicit funding from third parties and orchestrate his position as president or CEO of the companies he formed.

56.    This pattern of raising capital started as early as 1998, as set forth herein, when Rappaport solicited investors for a tech company that never got off the ground, leaving his partner holding the bag, and this practice continued over the next 20 years.

57.    Rappaport has been a longtime fraudster, defrauding individuals, family members and financial institutions out of funds, including investors of projects undertaken by Rappaport.

58.    Rappaport has a long history of deceptive business practices and failed projects with defrauding investors.

59.    Rappaport's contention on LHG's website that he has "more than thirty (30) years' experience in the initiation and development of successful businesses" is a misrepresentation, as it does not reflect the truth, which is that every project he has commenced has ended in failure for investors but a windfall for Rappaport and his family.

60.      Rappaport and Popky obtained funding from investors to create a "Lifestyle Health Facility" in Bensalem, Pennsylvania ("Facility Project").

61.      The Facility Project was a scheme to defraud Customers and had no ability to be completed.

62.      The $9 million that was obtained as a loan from Customers was used largely for Rappaport personally; for Vicky's day spa an unrelated entity and a violation of the loan covenants; and to fund the lifestyles of Popky, Rappaport and Vicky – essentially, funds were siphoned off into the Spa and used by the others to fund their lavish lifestyles, a longtime practice of Rappaport.

63.      The principals of LHG transferred and/or placed the property at 1 New Road, Bensalem, PA 19020 ("Bensalem Property") into Lifestyle REI for the purpose of defrauding creditors (specifically Customers). The pattern of creating various shell corporations and the transfer of assets into these companies was also a common practice of Rappaport's.  This practice created insolvent corporation, yet yielded payment to Rappaport.

64.      In conjunction with the transfer of the Bensalem Property, Rappaport arranged for a "kick-back" to be made to Halbreiner to foster and encourage her assistance in acquiring the loan from Customers.

65.      Halbreiner acted in collusion with Rappaport to obtain the loan from Customers, and she received improper financial benefit in connection with such assistance and/or collusion, as her cooperation and assistance were necessary to allow for the $9 million loan to be funded.

66.      Halbreiner's financial benefit was, upon information and belief, either received directly or indirectly through other family members, including her husband, Robert Halbreiner. At the commencement of this lawsuit, Halbreiner was given the opportunity to cooperate and to provide documentation, including a full financial disclosure, but she refused.

67.     Halbreiner was critical to the loan being granted, and she actively participated in and deliberately shielded the deception, even after obtaining one fraudulent SBLOC and continuing to work with the other Defendants to obtain another fraudulent SBLOC.

68.     Halbreiner knew that Rappaport was not creditworthy, but she pushed the loan through regardless.  Halbreiner had a long relationship with Rappaport dating back to her prior bank.

69.     With the assistance of Rappaport, Vicky, Halbreiner, Santiago, Dickey, Popky, the Metro Defendants, Muck, the Lifestyle Defendants orchestrated a massive fraud against Customers.

70.     LHG had no income, no revenue and no verifiable projections; the loan from Customers was nothing more than a money grab – a scheme to defraud Customers, as was his pattern over the course of nearly two decades, as set forth herein.

71.     The scheme was uncovered as a result of Customers' attempting to redeem the SBLOC and being notified that the SBLOC was fraudulent, counterfeit and/or otherwise fake. The sole security for the $9 million loan was a fraud.

72.     Defendants Rappaport, Vicky, Popky, Dickey, Santiago, Kohl and Muck, along with other individuals who are unknown John Does 1 through 20, at various times emailed and mailed documents and related communication to Customers, including LHG's Business Plan, which were relied upon by Customers and are described as Racketeering Acts herein.

73.     The business plan that was submitted by the Defendants ("Business Plan") was an intentionally deceptive document providing information to lend LHG false credibility, including a document that listed itself as a "memorandum and confidential" ("Memorandum").

74.     The Memorandum was used allegedly to elicit investor participation, as well as the extension of funding from third parties, including Customers.

75.     The Memorandum and Business Plan were part of a scheme, intentionally deceptive with little or no factual basis.

76.     Embodied in the Memorandum were various communications, including a deceptive overview of the Facility Project.

77.     Popky was a key part of the deceptive practices, as he, as a medical doctor, was necessary for obtaining other investor participation from third parties and acted as the liaison between these investors and LHG.  Popky was also the liaison to obtaining medical investors.

78.     The Memorandum included statements that, "Lifestyle Healthcare Group, Inc. is currently raising equity capital to fund the corporation through various limited partnerships in the project. Invested funds will be used for the following: Equipment, marketing, operation expenses and expansion."

79.     The statement above, made in furtherance of the scheme to defraud, is false and misleading; only a limited amount of the funds disbursed from Customers were used for equipment, marketing, operation expenses or expansion. Rather, the funds were used to bankroll the lavish lifestyles of Rappaport, Vicky and Popky, including the transfer of funds from the Customers loan to a trust created by Popky.

80.     The funds were further dissipated to Vicky's Spa, as well as to her son, Muck's for his living expenses, all in furtherance of the scheme.  The loan agreement did not permit funds to be transferred to the Spa, a third party unrelated to the transaction.

81.     Further, the Memorandum states that, "we acquired 10.75 acres of ground to construct a 200,000 square foot multi-specialty outpatient medical diagnostic and surgery center along with the an 80,000 square foot LTC long-term acute care/specialty care hospital that will be strategically located near Routes 1, I-95 and the Pennsylvania Turnpike. We are in negotiations requiring an additional five

(5) acres for the athletic complex." This representation was blatantly false. Despite the submission of this Business Plan to Customers, Popky and Rappaport subsequently acquired additional financing from Kennedy Funding ("Kennedy") and granted Kennedy a mortgage on the Bensalem Property.

82.    Further, the Bensalem Property was eventually transferred for no consideration to Lifestyle REI, a new LLC owned and controlled by Rappaport; Halbreiner knew of this transfer, and she knew of the loan from Kennedy Funding.  Lifestyle Real Estate Lender LLC ("Kennedy Funding") in June of 2016 commenced a Foreclosure in the Bucks County Court of Common Pleas under Case No. 2016-03634.

83.    In essence, Defendants fraudulently obtained approximately $12 million to supposedly fund the Facility Project, yet the Customers funds were not even use to obtain the property as set forth in the Business Plan submitted to Customers. The Business Plan was intentionally provided to Customers for the purpose of misleading the bank and inducing it to loan the money.

84.    Further misrepresentations made in furtherance of the scheme to defraud, described with particularity as Racketeering Acts herein, included that "a local company has agreed to construct the main 200,000 foot facility 80,000 square foot hospital skilled nursing building and parking structure. We are in negotiations with several parties who have expressed willingness to fund the construction." This was a complete fabrication. There was an agreement, but little else. In order to induce investors, the fraudsters created an illusion of viability with an elaborate website, business plan and related documents. It was nothing more than a scheme to defraud Customers and other investors.

85.    Further misrepresentations included, "Mr. Rappaport has more than 30 years' experience in the initiation and development of successful business including capital acquisition and business operations. He's formerly founder chairman and CEO of Medeikon Corporation a medical device company using optical technology for cardiovascular applications where he raised more than

-12-

$10 million in startup monies …" Rappaport represented that he maintains several CEO and chairman positions in high-tech startup companies including Quison Technology. These were failures. Rather, Rappaport has been a fraud throughout his life; his previous efforts to defraud include the development and fraudulent conduct involving the Delaware Valley Plastic Surgery Center ("DVPSC"), a project with eerily similar characteristics to the fraud perpetrated here. Rappaport also held himself out as a doctor which upon information and belief was false and done to create a more viable appearance.

86.     Throughout the process of funding the $9 million loan that was extended to LHG, various false representations were made to Customers as well as other individuals.

87.     The entire scheme was fraudulent at inception, and it proceeded forward with the help of Halbreiner who, upon information and belief, received a fee and/or "kick-back" from Rappaport, LHG and related Defendants.

88.     The Defendants conspired to defraud Customers via a litany of fraudulent statements and deceptive communications mailed or emailed, described with particularity herein as Racketeering Acts, including the issuance of a counterfeit or fictitious SBLOC from Metro, Kohl and Santiago. Upon information and belief, the scheme was fostered by the submission of the counterfeit SBLOC documents via mail and/or FedEx. The scheme was aided by providing a fee or kick-back to Halbreiner, a loan officer of a federally insured banking institution. The SBLOC was forwarded via mail or other common carrier with a fee carved out for Metro to be paid at loan closing and with a payment to Halbreiner.

89.     Halbreiner was a key party to the scheme; she even intended to travel to New York with Rappaport to meet with individuals and/or assist Deutsche Bank in order to issue the originally counterfeit SBLOC.

90.     On or about June 17, 2013, Halbreiner forwarded via email a communication to third parties with a "proof of funds" letter to potential brokers. See Racketeering Acts ¶ xvii, herein. This communication was forwarded via email even though Rappaport and LHG didn't have any funds at Customers or availability with any existing credit facilities. Halbreiner, as a senior loan officer of Customers, knew this would be misleading.

91.     On June 21, 2013, Halbreiner forwarded via email a series of communications to senior management at Customers advising that another standby letter of credit was being submitted after the initial Deutsche Bank letter was deemed counterfeit; thus, despite her knowledge that the Deutsche Bank SBLOC submitted by LHG was fake, she continued her assistance in the fraud. See Racketeering Acts ¶ xix, herein.

92.     Halbreiner's email communications regarding the new SBLOC were forwarded despite Halbreiner's knowledge that Lifestyle had no income, no revenue and essentially no assets.

93.     Rappaport assisted in forwarding emails that were either false or misleading, which he knew would be relied upon. See Racketeering Acts ¶ xi, herein, Rappaport email dated May 14, 2013 to Halbreiner with a new SBLOC draft, which Halbreiner forwarded to Customers outside counsel for review.

94.     Rappaport, Popky and Halbreiner were aware that Metro and Santiago were obviously running a scam; despite this, they continued to use Metro to obtain a new SBLOC.

95.     Halbreiner knew that an SBLOC must be backed by liquid collateral, which Rappaport did not have.

96.     Halbreiner, despite being in receipt of the initial fraudulent Deutsche Bank SBLOC, continued to market and engage other third parties concerning letters of credit on behalf of LHG.

97.     Halbreiner, a senior lender with over 30 years' experience, assisted and colluded in the scheme by ignoring the initial counterfeit letter, disregarding the lack of collateral of the borrower or any other Defendants needed to support a legitimate SBLOC, ignoring the absence of any viable financial plan to support the project, engaging in other dishonest acts and, despite all of the foregoing, allowing the loan transaction to proceed to closing.

98.     Halbreiner is believed to have received direct or indirect compensation or other benefits from Rappaport in exchange for her assistance in obtaining the $9 million loan from Customers.

99.     On July 29, 2013 (the exact date the $9 million loan was scheduled to close), in furtherance of the scheme and to conceal her role, Halbreiner, upon information and belief, opened a PNC Bank account for the purpose of personally using electronic accounts, electronic checks and account transfers to hide her actions from Customers.

100.     Closing on the loan was postponed, since the initial SBLOC allegedly obtained from Deutsche Bank was deemed fraudulent as a result of concerns raised from outside counsel for Customers.

101.     On July 30, 2013, Halbreiner emailed Fred Rappaport at 5:04 p.m. with "FYI SPL Site" in the subject line outlining the apparent transpired fraudulent documents submitted by Deutsche. See Racketeering Acts ¶ xxvi, herein. Halbreiner was unfazed that Customers was almost defrauded of $9 million.

102.     Halbreiner failed to immediately stop the funding process concerning the fraudulent documents submitted allegedly from Deutsche. Halbreiner, rather than stop the funding process, worked to obtain a "better" SBLOC that would pass security. The fraud could only be accomplished with a senior banker that was involved in the scheme.

103.    On August 5, 2013 Customers' outside counsel notified Halbreiner of Metro's suspicious background, sending her a link to a government regulatory bulletin advising all financial institutions that Metro is not licensed or registered or even supervised by New Zealand authorities.

104.    Counsel for Customers said to Halbreiner, "I trust Fred is proceeding with caution"; Halbreiner then forwarded this email to Rappaport with an FYI.

105.    No other communication was made concerning this apparent knowledge that Metro was a rogue financial institution.

106.    Halbreiner did not forward this communication from counsel to anyone senior at Customers.

107.    Halbreiner, despite years of banking experience and extensive post-graduate education, fostered and assisted in the fraud.

108.    Despite knowledge that the financial broker that Rappaport was using to obtain a SBLOC for over $9 million was the subject of a governmental warning concerning fraudulent conduct, Halbreiner continued with the scheme.

109.    Halbreiner knew that the $9 million loan's sole security was to be the counterfeit SBLOC.

110.    On August 23, 2013, Rappaport forwarded via email to Halbreiner a "suspicious" email that said only, "TD line which is attached." See Racketeering Acts ¶ xxxv, herein.

111.    Halbreiner then forwarded via email the email to Customers' outside counsel, Tim Duffy ("Duffy") on August 23, 2013 at 9:13 a.m. asking counsel to verify whether the language is acceptable and to ask his additional legal fee. See Racketeering Acts ¶ xxxvi, herein.

-16-

112. Duffy responded by email at <u>10:32 a.m.</u> stating that the language is standard and acceptable; he then advised that he would get the modification agreement and fee to her later this morning. <u>See Racketeering Acts ¶ xxxvi</u>, herein.

113. Halbreiner failed to provide counsel with the complete picture of the fraudulent documents, apparently attempting to maintain a veil of secrecy.

114. Ultimately, the loan proceeded forward when LHG was able to obtain, with the assistance of Halbreiner, Rappaport, Santiago, Metro, Kohl and IEG, another SBLOC purported to be from TD Bank.

115. On August 29, 2013, the day of funding on the $9 million loan, Halbreiner emailed Rappaport at **9:05 a.m.** stating, "<u>have not received yet it was supposed to be here by 8:30</u>," apparently in a panic at not having received the TD Bank SBLOC in a timely manner. <u>See Racketeering Acts ¶ xxxix</u>, herein.

116. Rappaport replied at **9:09** stating "FedEx said they delivered it to the front desk signed by R. Moody." <u>See Racketeering Acts ¶ xl</u>, herein.

117. Halbreiner responded at <u>9:10 a.m.</u> and forwards the email to Jonathan Klass ("Klass"), an employee at Customers, asking if he can identify R. Moody; Klass responded at <u>9:22 a.m.</u> that R. Moody worked at the credit union downstairs, a business unrelated to Customers in a separate location in the building. <u>See Racketeering Acts ¶ xli</u>, herein.

118. Incredulously, Rappaport responds at 9:35 a.m. claiming to be at the Customers' office with Klass and exclaiming, "<u>it looks fine. Happy Birthday ... we got it done!</u>" <u>See Racketeering Acts ¶ xlii</u>, herein.

119.    Halbreiner appears not to have been at the bank location on that date, but she was within this District. She later claimed to have verified the validity of the SBLOC with a TD Bank representative on August 28, 2013.

120.    Halbreiner explained that she had received a call from "someone" at TD Bank verifying that the SBLOC was being sent, although she was unable to recount the name of that person or the phone number. Halbreiner also failed to keep any records of the conversation.

121.    Halbreiner's statement made to Customers upon discovery of the counterfeit SBLOC cannot be rectified with the facts. Her alleged conversation with TD appears to be false and misleading, and a deliberate attempt to cover up her involvement.

122.    At 1:05 p.m. on August 29, 2013, Halbreiner emailed Rappaport, "everything has been disbursed. I will be sending an email to release the money in the account." See Racketeering Acts ¶ xliii, herein.

123.    On August 29, 2013, the fraudulent TD Bank SBLOC was sent via Federal Express from Greenville, South Carolina and received by Halbreiner, working at Customers, within this district. See Racketeering Acts, Mail Fraud, ¶ 270.

124.    Despite a litany of blatant red flags, Halbreiner disbursed $9 million to the perpetual, long-time fraudster Rappaport and his conspirators. The loan has no security.

*THE FRAUD CONTINUES*

125.    On December 31, 2013, James Hornack, an employee of Customers, emailed Halbreiner regarding Kohl's trying to reach her with "urgent" communication. See Racketeering Acts, ¶ xliv.

126.    On January 15, 2014, Halbreiner's husband, Robert Halbreiner, responds to Germetru@aol.com and Halbreiner regarding confirmation received for "Jay's save the date

-18-

announcement," stating, "great at Philadelphia airport waiting for delayed flight to Greenville, South Carolina travel sucks." See Racketeering Acts, ¶ xlv.

127.    On August 7, 2014, Halbreiner notifies Rappaport of an overdraft on his checking account and responds "FYI this is starting not to look good." At that point, Lifestyle had repeated overdrafts, yet Halbreiner raised no alarms to any senior authority at Customers.

128.    Despite the knowledge that LHG had a loan for $9 million, Halbreiner only seeks to ensure the fraudulent scheme continues and potentially fund future loans with another counterfeit SBLOC.

129.    On August 8, 2014, Kevin Beauparlant ("Beauparlant"), a Customers employee, communicated to Halbreiner that Rappaport was in and he made a deposit from Popky's personal account for $11,600.00; he also made another deposit "for tomorrow" for $6,000.00 from the Lifestyle One LP account at Univest.

130.    Beauparlant wonders, "how can he transfer from Popky's personal account?", but Halbreiner raises no concerns.

131.    The LHG loan defaulted on July 21, 2015, and Customers attempted to exercise the SBLOC.

132.    On or about July 21, 2015, Halbreiner received communication from TD Bank that the SBLOC was fictitious. The scheme began to unravel.

## THE RAPPAPORT ENTERPRISE ATTEMPTS TO OBTAIN A $10 MILLION LOAN FROM CUSTOMERS

133.    On Saturday, February 1, 2014, Kohl sent an email communication to Rappaport about another TD letter of credit, attempting to obtain another loan. Kohl and Rappaport sought to replicate a "real" TD Bank letter of credit, apparently realizing they could obtain other funding and attempting to orchestrate another fraudulent loan. See Racketeering Acts, ¶ xlvi.

134. Halbreiner was copied on this February 1, 2014 email. The letter of credit that was attached in that email is different from the TD document that Halbreiner previously accepted for the Lifestyle loan.

135. The documents were dramatically different in appearance as well as content, but Halbreiner raised no concern, because she was part of the ongoing conspiracy to defraud Customers.

136. Kohl, representing Metro, explains, "the attached SBLOC language that Customers Bank likes". The co-conspirators are attempting to obtain additional funds from Customers. See Racketeering Acts, ¶ xlvi.

137. Halbreiner had tried to orchestrate another loan for $10 million using Metro, attempting to place the loan in a different business unit of Customers.

138. Halbreiner and Rappaport also recently tried to orchestrate another loan from Customers. See Racketeering Acts ¶ xlvii – October 29, 2014 emails between Halbreiner and Rappaport regarding initiating a new "bridge loan"; Racketeering Acts ¶ l – December 10, 2014 email between Duffy and Halbreiner regarding the "bridge loan".

### ENTERPRISE OBTAINS $3.5 MILLION LOAN FROM KENNEDY FUNDING, SECURED BY THE PROPERTY THE CUSTOMERS LOAN WAS TO BE USED TO IMPROVE

139. On January 28, 2015, Rappaport and Halbreiner engage in an email conversation concerning LHG's continual overdrafts. See Racketeering Acts, ¶ li.

140. Rappaport advises Halbreiner that he wants information on their real estate appraisal and, "he needs a correct one now for our $3.5 million loan." See Racketeering Acts, ¶ lii.

141. This communication centers upon LHG obtaining additional funds on the Bensalem Property, which the Customers loan was to be used to improve and to ultimately serve as security for the $9 million loan.

142.   Halbreiner raised no concern that Rappaport was using the Bensalem Property to obtain another $3.5 million from another lender, despite the fact that the $9 million Customers loan was taken out to build the complex, and placing a lien on the property put Customers in jeopardy.

143.   Halbreiner raised no concern about a third-party funding source being needed for this project and the fact that there was a continued pattern of overdrafts in the checking account of LHG.

144.   Halbreiner did not object because she was part of the conspiracy.

145.   Financial statement notes of LHG disclosed a $3.5 million line of credit obtained by Lifestyle REI in March 2015; this is the Kennedy Funding loan, which was an additional loan on the property that was ultimately to be used as security for Customers.

146.   Upon information and belief, the Kennedy Funding loan is in default, and Kennedy Funding has commenced foreclosure proceedings in the Bucks County Court of Common Pleas under Case No. 2016-03634 as Plaintiff, "Lifestyle Real Estate Lender LLC.

### *ATTEMPTED FRAUDS OF QUICKLINK CAPITAL AND DM CAPITAL BY ENTERPRISE MEMBERS*

147.   The Enterprise members, including Metro, Santiago, Kohl and Halbreiner, working together, have not been satisfied with simply defrauding Customers out of $9 million but have conducted other frauds and schemes to further defraud lenders in addition to Customers and Kennedy Funding.   See Metro (Kohl) and Halbreiner attempting another fraud in November 2013 of DM Capital using false SBLOCs; and Metro (Santiago) and Halbreiner planning and attempting another fraud in 2014-2015 of Quicklinks Capital (Rappaport's role in these attempted frauds is not known at this time).   See paragraph 213 below for overt acts describing these other potential victims.

<u>DEFENDANTS USED PROCEEDS OF CUSTOMERS LOAN FOR PERSONAL BENEFIT</u>

148.    Michael Fuoco ("Fuoco"), the former Chief Operating Officer of LHG, has provided information that LHG was an insolvent entity and its principals had engaged in a pattern of deepening insolvency and were the alter-egos of the various insolvent entities.

149.    Fuoco stated that Halbreiner had received a "kick-back" and was compensated for the loan transaction by Rappaport and others.

150.    Fuoco specifically questioned Rappaport as to whether they "needed to take care of Halbreiner" and was advised, "she had already been taken care of". Fuoco testified that he assumed this to mean Halbreiner received a kick-back.

151.    Fuoco stated that the Bensalem Property was transferred and/or placed in the name of Lifestyle REI to hinder or delay creditors, including Customers.

152.    Fuoco stated that when funds were disbursed from the Customers loan, Popky transferred a half a million dollars to a trust based in California controlled by Popky, presumable the Popky Trust.

153.    These funds were transferred at a time when the corporation was insolvent and the only funds available to LHG were the loan funds provided by Customers.

154.    The funds were supposed to be used for the development of LHG; however, the loan proceeds were substantially siphoned by Rappaport, Popky, Vicky, Muck, the Spa, and others for personal use.

155.    Upon information and belief, Rappaport, Popky and Vicky operated various corporations and limited liability entities and/or limited partnerships, which were their alter egos, and shared common identity of interest with the Defendants.

156.    These include the Spa; LMG; Lifestyle REI; and LHG. Additionally, the Defendants organized another entity known as Lifestyle Holdings, LLC.

157.    These defendant corporate entities appear to have been insolvent and undercapitalized, and they were clearly the alter egos of Popky, Rappaport and Vicky.

158.    Vicky appears to have received substantial income for virtually no work other than working at the Spa entity.

159.    LHG reported a loss of over $3 million in 2014 with gross receipts of $200,000.00.

160.    Despite the representations that LHG was a viable entity, the 2013 tax return reports interest in the amount of $47.00 as the only source of income; a 2012 tax return reflected no income.

161.    LHG also reported a net operating loss of approximately $2.4 million dollars in 2014.

162.    LHG listed $4.8 million dollars of assets on the 2014 tax return. However, approximately $3.4 million dollars represents an investment in real estate. This appears to be the Bensalem Property, which the Customers loan was supposed to be used to improve, and which Kennedy Funding took as collateral for its $3.5 million loan.

163.    Compensation of the officers was listed anywhere from zero to $250,000 in the years 2012 through 2015.

164.    LMG's 2014 tax return reported a loss of $26,000.00 and zero income.

165.    Financial documents disclosed the value of the Bensalame Property as $1 million, with construction in progress. This appears to be a complete fabrication.

166.    The Spa, which was controlled and owned and/or operated by Vicky, indicated income of $94,000.00 in 2014 but a taxable loss of $250,000.00. The Spa's tax return revealed a consistent loss of over $200,000.00 on an annual basis.

167.    Fuoco indicated that the payroll for the Spa, an unrelated entity, was also being paid by the proceeds of the Customer's loan.

168.    Financial statements produced by the Defendants indicated on a combined basis, the Lifestyle Defendants had substantial losses of over $2.2 million in 2014 and $1.5 million in 2013.

169.    Defendants' tax return listed assets totaling $10 million in 2014 and $7 million in 2013. Defendants represented two-thirds of the value of the assets as land and construction in progress. There appears to be little or no basis to make that representation.

170.    Further investigation indicated that the notes of the financial statement for 2014 described a period of 2013 adjustment. The financial statement indicated an adjustment of approximately a $1 million was attributable to financing costs and capitalized interest incorrectly recorded as construction in progress in 2013.

171.    It appears, based upon a review, that there were substantial funds disbursed from these entities. There appear to be substantial payments for personal expenses paid from LHG to American Express.

172.    During this period, LHG had total disbursements of $15,622,597.00 less adjustments of $5,116,389.00 for a total adjusted disbursement of $10,506,208.00.

173.    At the same time, LMG had adjusted disbursements of $63,761.00, and the Spa had total disbursements of $814,415.00.

174.    The total adjusted disbursements were $11,383,384.00 for all the entities, including LHG, LMG and the Spa.

175.    **These disbursements are from entities with essentially no income.** The corporations were insolvent. The pattern of conduct by the officers created a pattern of deepening insolvency.

176.    The corporations used the funds from the Customers loan to pay the personal expenses and fund the lavish lifestyles of the individuals rather than to fund the construction of a healthcare facility.  This was a "money grab".

## COUNT ONE

### Civil RICO Pursuant to 18 U.S.C. § 1962(c) – Santiago, Rappaport, Vicky, Popky, Halbreiner, Kohl and Metro

177.    As to Santiago, Rappaport, Vicky, Popky, Halbreiner, Kohl, IEG, Dickey and Metro ("RICO Defendants"), Plaintiff realleges each and every allegation and fraud set forth in Paragraphs 1 through 176 as if set forth herein at length.

### *THE ENTERPRISE*

178.    The RICO Defendants and others associated in fact to constitute an Enterprise, led by Rappaport, which functioned for the purpose of defrauding banks, investors and others through various fraudulent schemes ("Rappaport Enterprise").

179.    Rappaport is a leader of the Rappaport Enterprise and, along with the other RICO Defendants and others, has engaged in operations for the purpose of defrauding businesses and others through various racketeering acts which have included the use of the false SBLOCs and, in past activities, deception of investors and lenders, as set forth below.

180.    An enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4).

181.    The Rappaport Enterprise is a RICO enterprise as described in 18 U.S.C. § 1961(4): an association in fact of legal entities and individuals led by Rappaport and others and under the RICO Defendants' common control.

182.    At all times relevant to this Complaint, the Rappaport Enterprise had a structure and organization and existed apart from its predicate acts as set forth herein. As described in more detail at Paragraph 187, Enterprise members served in important roles so that the Enterprise could accomplish its illegal objectives and goals.  The Rappaport Enterprise's components functioned together as a continuing unit, i.e., they were under the control of the RICO Defendants and existed for a common purpose, i.e. for the economic benefit and gain of the RICO Defendants by using false SBLOCs to defraud banks and other lenders, **as further described below in Paragraph 190.**

183.    The Rappaport Enterprise has existed for many years and thus has a longevity sufficient to permit each of the RICO Defendants to pursue the Rappaport Enterprise's purpose.

184.    Each RICO Defendant is distinct and separate from the association-in-fact enterprise of which he is a component part.

185.    As described further below, specifically **in Paragraph 190**, the RICO Defendants associated with the Rappaport Enterprise, and conducted and participated, directly or indirectly, in the conduct of the affairs of the Rappaport Enterprise through their involvement in the underlying racketeering offenses as well as through the continuous concealment and promotion of the activities of the Enterprise, which constituted violations of the mail fraud and wire fraud statutes.

186.    The RICO Defendants each conducted or participated in the conduct of the Rappaport Enterprise's affairs through a pattern of racketeering activity, as set forth herein and described in more detail **in Paragraph 190 below**.

187.    The RICO Defendants' participation in the Rappaport Enterprise were necessary for the successful operation of the fraudulent scheme.

188.    As described in more detail **in Paragraph 190**, the Rappaport Enterprise, consisting of an association of the individual and corporate RICO Defendants working together with a common

purpose to defraud banks and others through the issuance of false SBLOCs, has a structure separate and apart from the pattern of racketeering activity in which the RICO Defendants engaged.

189.    The activities of the Rappaport Enterprise affected interstate commerce based on defendants' use of the Internet, and agreements with entities in other states in conjunction with the process of obtaining, transmitting, billing and collecting fraudulent monies in furtherance of the racketeering scheme as alleged in the Complaint.

190.    Each of the following participants played an important role in the conduct of the affairs of the Enterprise:

    a.  **Rappaport** spearheaded the Rappaport Enterprise and has been involved in fraudulent schemes as far back as at least 1998, when he first began scheming to defraud investors with Technology Capital Funding Group, LLC ("TCFG"), a startup purportedly created to develop energy technology. Rappaport approached his former employer, Harvey Seidman, a mortgage industry maven, to invest in the company, and they formed the LLC together. Over the course of several years, Rappaport used Seidman's money to "wine and dine" potential investors (over $100,000) and falsified Seidman's signature on certain documents. The company ultimately went nowhere. **Later, in 2008,** Rappaport, along with Vicky, lured Dr. Ted Katz ("Katz") and Dr. Algird Mameniskis ("Mameniskis") to work with them on a plan to develop multiple plastic surgery centers (including Valley Square Plastic Surgery).

        i.  Katz, a plastic surgeon, entered into a business partnership with Rappaport and Vicky after getting to know them socially. Rappaport set up the business, and Katz signed the lease. Wages for staff came from the practice income for several years; however, in the last year or two that the surgery center was in

business, Katz used his own personal funds, including his retirement funds, to pay staff and expenses, and he took no salary of his own, because expenses were higher than income for the practice. Rappaport assured Katz that business would improve; however, the landlord later sent the sheriff to lock the doors and auction property due to nonpayment of rent. At Rappaport's behest, the equipment was all moved to the Lifestyle Plastic Surgery Office. **Katz was** later informed by Valley Square's bookkeeper that the Rappaports were **double billing**, charging Katz and the LLC in order to get paid twice. Ultimately, Rappaport locked Katz out of the facility, denying him access to his patient files after Katz cut Rappaport off from the bank accounts.

ii. Mameniskis performed medical procedures for the group on a part time basis for about 1.5 years before receiving a call from Katz, who told him Rappaport had locked the doors and the business was shut down. Katz had to pay Mameniskis from his own money for the work performed.

iii. Around the same time, in 2008, Rappaport formed LHG and, with the help of Popky, Metro, Santiago, Kohl, IEG and Halbreiner, devised a scheme to obtain the $9 million Customers loan he never intended to repay and that he never intended to use as he said he would, attempting to use one false SBLOC and substituting it with another false SBLOC, neither of which was backed by any liquidity. He then spent all the money either on himself or on other members of the Rappaport Enterprise without a thought as to the Facility Project or repayment to Customers.

b. **Popky** provided his credit and funding, **along with his medical credentials**, for the Rappaport Enterprise, as Rappaport had filed multiple bankruptcies and could not get credit on his own. Popky assisted Rappaport in the scheme and drew a substantial salary from the Customers loan proceeds despite LHG's insolvency; he also transferred funds from the Customers loan to the Popky Trust and used Customers funds to pay off his American Express card after Rappaport, Vicky and others used it to pay for an extravagant tropical vacation. Popky was aware that Rappaport and Vicky were siphoning money to pay themselves and Muck rather than using the funds for their intended purpose, but he took no action to correct their fraudulent trajectory. He accepted his salary from funds that should have been used to develop the healthcare facility, knowing the facility would never be built.

c. **Halbreiner** was the insider at Customers who assisted the Rappaport Enterprise in obtaining a $9 million loan despite her absolute knowledge of LHG's near insolvency and Rappaport's lack of credit. As set forth above, Halbreiner, a senior officer, was instrumental in LHG's obtaining the loan from Customers with a fraudulent SBLOC. Despite all the red flags that arose during the loan process, Halbreiner continued forward with funding the loan, allowing submission of two false SBLOCs. Despite the initial submission of a fictitious SBLOC from Deutsche Bank, Halbreiner accepted a second SBLOC purportedly from TD Bank but did not even take proper steps to verify the $9 million instrument, accepting an alleged phone call from someone claiming to be from TD Bank and not bothering to confirm the document independently as she should have done. Upon information and belief, Halbreiner accepted additional money from Rappaport for her part in the Rappaport Enterprise and may have forwarded these funds

to her husband, Robert, to avoid detection. Halbreiner was a senior loan officer with decades of experience in commercial lending; her actions cannot be construed as simple naiveté or "a mistake". Halbreiner was also involved with the attempt to procure by fraud a separate $10 million loan from Customers for the benefit of Rappaport and others, and was involved in the $3.5 million loan from Kennedy Funding, which security had already been pledged under the Customers loan.

d.  **Vicky**, Rappaport's wife, benefited from the fruits of the Rappaport Enterprise by using the $9 million Customers loan proceeds to fund the Spa, which she ran. Vicky knew the loan proceeds were to be used for the Facility Project. She also used Customers funds to go on an expensive holiday with Rappaport and with her son, Muck. She invited Halbreiner to a "ladies' night" at the Spa.

e.  **Muck**, Vicky's son, was paid money from the proceeds of the Customers loan and used the funds for a tropical vacation with his mother and stepfather.

f.  **Santiago, Dickey and Metro** were the generators of the false SBLOC purportedly from TD Bank. These defendants have a long history of defrauding banks, having been sued multiple times and been under investigation by the FBI, including an FBI raid on Metro's location in Oklahoma. These defendants joined forces with Rappaport to defraud Customers of $9 million based upon an SBLOC that had no more value than the paper it was printed on. Santiago then attempted to use Halbreiner to obtain more loans from Customers for other clients based upon other false SBLOCs.

g.  **Kohl and IEG** also engaged in the Rappaport Enterprise by acting as an intermediary between Metro, Rappaport and Halbreiner. Kohl would eventually contact Halbreiner

to review an SBLOC for another client in an attempt to obtain another loan from Customers.

191.   The Defendants intended to commit mail and wire fraud in connection with the Customers loan, because the Defendants knew the SBLOCs were fraudulent and that LHG would never pay back the loan. At various times the Defendants forwarded communications, including the purported FedEx package that contained the TD Bank SBLOC, which was fraudulent and deceptive, as set forth more fully above and below. Said actions are a violation of 18 U.S.C. §§ 1341 and 1343.

*APPLICABLE STATUTES*

192.   18 U.S. Code § 1962(c) makes it unlawful for "any person employed by or associated with an enterprise engaged in or the activity of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt."

193.   18 U.S. Code § 1964(c) creates a private right of action for any person injured in his business or property by reason of violation of § 1962 and provides for threefold the damages sustained as a result of recovery for the cost of suit including reasonable attorney fees.

194.   As described in the Complaint, Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity at the effective date of RICO and also within 10 years of each individual act, specifically, Defendants' actions described violate the following provisions:

   a.   The federal wire fraud statute 18 U.S. Code § 1343, which is identified by 18 U.S. Code § 1961(1)(A) as indictable predicate act for purposes of racketeering. It provides in relevant part, "Whoever having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false fraudulent pretenses,

representations, or promises transmitted or caused to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals pictures or sounds for the purpose of executing such scheme or artifice shall be fined under this title and imprisoned not more for 20 years or both.

b. During the pertinent time, all RICO Defendants did cooperate jointly and severally in the commission of two or more of the RICO predicate acts that are itemized in the RICO Laws 18 U.S. Code § 1961(1)(A), and did so in violation of RICO Law.

c. The federal mail fraud statute, 18 U.S.C. § 1341, which is identified by 18 U.S. Code § 1961 as an indictable predicate act for purposes of racketeering, provides:

> Whoever having devised or intended to devise any scheme or artifice to the fraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security or other article, or anything represented to be or itimated or held out for such counterfeit or spurious article for the purpose of executing such scheme or artifice or attempting so to do, places any post office or authorized depository for mail matter, a matter or thing whenever to be sent or delivered by the postal service, or deposited or caused to be deposited a matter or thing whatever to be sent or delivered by any private or commercial interstate carrier or takes or receives therefrom any such matter or thing or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing shall be fined under this title or imprisoned not more than 20 years or both. 18 U.S. Code § 1341

195.    Plaintiff is informed and believes that each member of the Rappaport Enterprise played a role and acted in a mutual reliance on the common purpose of defrauding Customers out of $9 million, and engaging and attempting to engage in other illegal acts against Customers, and against other victims (e.g., Kennedy Funding; Quicklink Capital).

### *THE RACKETEERING VIOLATION*

196.    From on or about 2008, and continuing up through the date of the filing of this Third

Amended Complaint, the RICO Defendants, each of whom are persons associated with or employed

by the Enterprise, did knowingly and unlawfully conduct or participate, directly or indirectly, in the

Rappaport Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§

1961(1) and 1961(5), all in violation of 18 U.S.C. § 1962(c).

### *PATTERN OF RACKETEERING ACTIVITY*

197.    Over the course of two years, the RICO Defendants knowingly, intentionally and

recklessly engaged in an ongoing pattern of racketeering activity under 18 U.S. Code § 1962(c) by

committing the predicate acts of wire fraud and mail fraud as set forth above, i.e., significant mail and

email correspondence between the RICO Defendants and Customers' agents, as well as between and

among the RICO Defendants themselves.

198.    Defendants, having devised or intended to devise a scheme or artifice to defraud

Customers for, placed or knowingly caused to be placed in a post office or authorized depository for

mail matter documents or packages to be sent or delivered by the postal service or private or

commercial interstate carrier and received from these entities such documents, i.e. two separate

fraudulent SBLOCs delivered via Federal Express.

199.    Plaintiff alleges that the course of conduct engaged in by the RICO Defendants

constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a

pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5). Plaintiff can show the

relatedness prong because the predicate acts have the "similar purposes, results, participants, or

methods of commission or are related to the affairs of the Enterprise." All predicate acts had the same

purpose of misrepresenting the nature of the Customers loan (and other fraudulent loans) so that the RICO Defendants could defraud Customers, and others including investors, of millions of dollars.

200.    Plaintiff alleges that the continuity of the pattern of racketeering is closed-ended (see below) inasmuch as the $9 million Customers loan involved a series of related predicate offenses extended over two years (a substantial period of time). As described herein, the racketeering activity is open-ended (see below) as the predicate offenses involving fraud of lenders using false SBLOCs were part of the Rappaport Enterprise's regular way of doing business, and the Enterprise members continue to operate and associate, and remain a threat to others.

### *CLOSED-ENDED CONTINUITY*

201.    The racketeering acts described above show a significant flurry of activity over the course of two years, **from early 2013 to late 2015** when the fraud was discovered.

202.    Beginning in December 2012, as set forth above and below in the detailed specific Racketeering Acts, the RICO Defendants repeatedly used email and used regular mail to conduct their fraudulent enterprise.

203.    Throughout 2014, as set forth above, the RICO Defendants continued the fraudulent scheme.

204.    Throughout 2013 through 2015, as described below, the RICO Defendants continued the Customers loan racketeering activity by sending emails and mails designed to "lull" Customers into a sense of well-being when, in fact, the Defendants knew the borrower was insolvent, and were obtaining additional financing on the property (Kennedy Funding loan), despite the $9 million loan already outstanding with Customers, and despite LHG's repeatedly overdrawn accounts.

205.    Before the scam was discovered, Rappaport, via electronic mail as set forth above, and Halbreiner attempted to obtain an extension on the Customers loan before time ran out.

## *OPEN-ENDED CONTINUITY*

206.     The pattern of racketeering activity described in this Complaint is continuous, ongoing and will continue unless Defendants are enjoined from continuing these racketeering activities.

207.     While there are civil and criminal laws prohibiting fraud, deception and forgery, Rappaport and his cohorts believed these laws were rarely enforced and easily evaded.

208.     Metro and Santiago have had extensive dealings with other fraudulent documents to lie to other victims and defraud the public, and these Defendants will continue to do so unless prompt immediate and substantial law enforcement action is taken.

209.     Rappaport throughout the years has repeatedly engaged in the same activities: start multiple companies, rope in investors and lenders, and then shut down completely without repaying any of his debts before moving on to the next big thing.

210.     Engaging in the pattern of racketeering as set forth herein is the regular way Rappaport and his cohorts regularly conducts the operations of the association-in-fact enterprise he has created. Although certain of the players have changed, the enterprise has been ongoing since at least 2008.

211.     Rappaport began his illegal activities himself at least as far back as 1998, when he formed Capital Technology Group using the good faith funds provided by Seidman to develop a product that never went anywhere, falsifying Seidman's signature on documents before shutting the doors and never repaying Seidman for his investment.

212.     Rappaport continued when he set up a plastic surgery center, roping in two medical doctors – Katz and Mameniskis – as investors and/or employees before unceremoniously closing the business, leaving Katz to pay Mameniskis from his own money.

213.     In or before 2008, Rappaport formed the Lifestyle entities to continue his pattern of duping others into funding his sham projects and finally targeted a big windfall – $9 million from Customers.

214.     Rappaport and the other RICO Defendants will continue the cycle of deception and fraud well into the future if not stopped; for example, they have victimized <u>Kennedy Funding</u> for $3.5 million as they continued to fraudulently find financing for projects, and have attempted to obtain another $10 million loan from Customers Bank using Halbreiner as the insider.

215.     Enterprise members Kohl, Santiago, Metro and Halbreiner, working together, have emailed in 2014-2015 regarding using false SBLOCs to defraud other victims, i.e., DM Capital and Quicklink Capital.  See Paragraph 145 above, and emails below (Regarding DM Capital; in November 2013, Kohl began emailing Halbreiner about a separate client, a film company, DM Capital, LLC, that needed funding for a movie. He forwarded via email to Halbreiner on November 19, 2013, a sample TD Bank SBLOC for use in this other transaction.  Regarding Quicklinks, see, e.g., in April and June of 2015, Santiago continued contacting Halbreiner via email about Quicklinks Capital; Martin Ball advised Halbreiner that it seemed like a fraud and the bank would not do it.  On July 13, 2015, Halbreiner emailed Santiago stating she had received a TD Bank SBLOC via FedEx for the QuickLinks Capital loan. Martin Ball again advised that the bank would not be loaning the money.

216.     Thus, Enterprise members, including Rappaport, clearly remain a threat to others, and their racketeering activity meets the open-ended continuity test.

### *CONDUCTING THE AFFAIRS OF THE ENTERPRISE*

217.     The RICO Defendants participated in the "operation or management" of the Enterprise's affairs.

218.   Metro has had a long and extensive history of defrauding third parties through a series of negotiable instruments; in this case, it was a standby a letter of credit.

219.   Upon information and belief, Metro and Santiago engaged in a long pattern of deceptive practices in issuing standby letters of credit as well as other financial documents to third parties including Customers. Metro and Santiago have been the subject of numerous claims concerning fraudulent negotiable instruments and/or securities and related transactions, including transferring these negotiable instruments nationally and internationally.

220.   The Metro entities received part of the funds either directly or indirectly from Customers. Metro has presented itself as a financial institution entity. Part of Metro's role was to falsify and deceptively assist the fraudulent transaction as a normal and standard part of its commercial transaction involving the use of letters of credit and standby letters of credit.

221.   Metro and its principals worked with defendants including Rappaport, Halbreiner, IEG and Kohl in the transaction of depositing the funds wrongfully taken from Customers. This included a commission payment in excess of $1 million paid on a $9 million loan transaction.  Upon information and belief, Metro received over $1 million dollars from the counterfeit letter of credit.

222.   Santiago is an officer, owner or director of Metro and used the corporate format to participate in ongoing frauds around the United States and internationally. Metro holds itself out as a Licensed Financial Institution with Licenses from Australia, New Zealand and Panama, as well as the United States; however, upon information and belief, Metro has no such licensing and is a fraudulent company.

223.   Defendant Santiago is an officer, owner and/or director of Metro and published online:

> I serve as the International Banking Relationship Manager for
> Metropolitan Financial Holdings Ltd., formerly known as Metropolitan
> Bancorp Ltd. Through my work, I became the Institutional Affiliate for
> Estrategia Investimentos S.A., a bank located in Brazil.

224.    Santiago is a fraudster with a criminal past, including financial crimes.

225.    The fraud involved specific parties as outlined above. The scheme was that Customers would pay a one percent (1%) charge included in the request for funding by LHG; LHG would receive the $9 million with no intent to repay; and Metro and Halbreiner would receive a kick-back for defrauding Customers.

226.    Halbreiner knew that the TD Bank SBLOC was fictitious and/or fraudulent. She had already received one fictitious SBLOC from the other RICO Defendants, but despite this, Halbreiner, undaunted, continued the scheme by obtaining a another SBLOC, purportedly from TD Bank.

227.    The transaction was conducted via mail or other common carrier.

228.    Santiago, Rappaport, Kohl, Metro and IEG continually represented they were viable institutional entities and their role was to falsely and deceptively portray the fraudulent transaction as a normal financial transaction.

229.    Rappaport and Halbreiner knew or should have known these transactions were harmful, and they intentionally misled Customers.

230.    Halbreiner intentionally failed to disclose the fictitious TD Bank SBLOC.

231.    The TD Bank SBLOC induced Customers to extend a $9 million loan on worthless security – essentially, the entire transaction was a theft from Customers.

232.    Upon information and belief, Santiago, apparently a convicted felon, is married to Dickey.

233.    Kohl is listed as a Managing Director of Metro.

234.    Dickey is also listed a Founder of Kohl's company, IEG.

235.    These corporations appear to be insolvent and were shell corporations used to foster and continue the schemes against third parties, including Customers.

236.    Metro has attempted to operate as a bank or other financial entity in the U.S. without being licensed. As set forth, Metro claimed to be a registered bank in New Zealand, Australia and Panama. Metro's website misleads the public by failing to disclose lost licenses. Upon information and belief, New Zealand and Australia do not have any valid registration or banking registers for these entities.

237.    Upon information and belief, Santiago is a rogue criminal who was previously sentenced to State Prison in California resulting from felony charges connected to a real estate fraud.

238.    Halbreiner was on notice that Metro was identified as a company was not licensed or supervised by the Reserve Bank of New Zealand, nor did it have a New Zealand banking license. It was not registered as an off-shore financial corporation as claimed on its website. Despite this information, Halbreiner continued with the fraud and failed to disclose this to senior members at Customers.

239.    An SBLOC is a negotiable instrument only as viable as the underlying credit of the issuer and the validity of the instrument itself. The document that was submitted to Customers was worthless and fraudulent.

240.    Further, Rappaport apparently failed to execute the indemnification agreement, which would have triggered his responsibility. Rappaport knew that he had a requirement to do this.

241.    Halbreiner knew that Rappaport did not have the collateral or financial wherewithal to support this SBLOC.

242.    Halbreiner was a senior lender at Customers who had an extensive history with Rappaport.

243.    Rappaport, along with his partner, Popky, devised a scheme to allegedly construct "a lifestyle location", which had little or no chances of ever being built.

244.    Rappaport and Popky had no expertise in development of a lifestyle project or healthcare complex. In fact, Rappaport had been engaged in a series of fraudulent and deceptive practices over a long business life, as set forth herein.

245.    The scheme was only successful due to Halbreiner in her capacity as a loan officer at Customers.

246.    The fraudulent SBLOC from Deutsche Bank should have triggered any individual at her level that the transaction was fraught with problems and was most likely a scheme to defraud the bank; however, Halbreiner 1) failed to immediately notify senior members at Customers about the initial SBLOC and then continued to work with Rappaport and LHG, despite this huge red flag, in obtaining another fraudulent SBLOC, because she was a part of the scheme, receiving payments for having completed the funding of the loan.

247.    Throughout the process, Rappaport and his cohorts provided false and misleading information, which included false statements and documents submitted to Customers about the viability of the proposed facility; Customers relied on those statements and documents to the tune of $9 million, resulting in the release of these funds to LHG to be used by Rappaport, Vicky, Popky and Muck for personal expenses.

248.    Throughout this process Metro, Kohl, and Santiago represented that they were legitimate businesses trading and providing standby letters of credit on behalf of Metro. Santiago knew along with Halbreiner and Rappaport that these documents were false negotiable instruments. Specifically, Santiago knew that the investments were worthless and that the underlying standby letter of credit was essentially a scheme with no value, and no bank or other financial institution would be honoring the instrument and providing funds as represented.

-40-

249.   The RICO Defendants knew that the SBLOC had no value and would be worthless if presented by the holder due to a default on the underlying loan agreement.

250.   The RICO Defendants knew the Lifestyle Defendants had no financial viability to support the SBLOC.

251.   Throughout the transaction, Santiago, as well as the other Defendants, including Rappaport, Popky and Halbreiner, knew that the TD Bank SBLOC was fraudulent. The participation of the RICO Defendants resulted in a large-scale fraud upon Customers.

252.   Following the funding of the loan, as set forth above, the RICO Defendants used a substantial portion of the loan proceeds to live a lavish lifestyle and pay themselves back for monies invested.

253.   Rappaport and Popky transferred funds into Trust Accounts and siphoned other funds off into Vicky's Spa.

254.   There was also a transfer of the Bensalem Property into Lifestyle REI, a related company controlled by Rappaport and Popky. This transfer was at a time when they knew they were going to defraud creditors. The former Chief Operating Officer of LHG, Fuoco, provided information that the transfer was set up to avoid creditors.

255.   The RICO Defendants were successful in enabling a fraud to be committed. Halbreiner was a key and essential component of the fraud. Halbreiner's status as an "insider" at Customers enabled the fraud to be committed.

256.   Had any of the Defendants timely disclosed the fraud and misrepresentations by Co-Defendants, the fraud could have been avoided and Customers would have been protected.

257.    On August 29, 2013, Metro, via Rappaport, forwarded the TD Bank SBLOC to Customers, which relied upon the instrument. In fact, the TD Bank SBLOC was worthless, counterfeit or otherwise non-negotiable.  See Racketeering Acts, ¶¶ xxxix - xliii; Mail Fraud, ¶ 270.

258.    On July 21, 2015, Customers attempted to redeem the SBLOC at TD Bank and was immediately advised that the SBLOC would not be honored as a result of being a fictitious and/or counterfeit document. Specifically, Customers was advised that the SBLOC was worthless.

259.    Customers has lost approximately $9 million. As set forth previously, there was a prior document issued under the name of Deutsche Bank, which was also worthless. Halbreiner was aware of the prior Deutsche Bank SBLOC.

260.    Customers received a series of emails and other related communication which were false and misleading.  See Racketeering Acts below.

261.    There were several significant "features" of these ongoing emails and communications from Rappaport and the other cohorts to Halbreiner and vice-versa. Specifically, there were numerous false statements including the SBLOC.

262.    The RICO Defendants believed that their skill in perpetrating fraudulent schemes, ability to hide funds and willingness to provide false provisions of what occurred will enable them to escape punishment.

263.    The RICO Defendants had reason to know that Customers would provide funding in excess of $9 million for the fraudulent and worthless SBLOC, and their continued communications with one another would prevent discovery of the fraud, wherein timely intervention could prevent the fraud or help recover all or part of the monies taken.

264.    On July 21, 2015, Customers uncovered the fraud. Halbreiner attempted to delay the scheme by indicating that Rappaport was in fact "not a crook". Subsequent investigation into

Halbreiner's email and other electronic communications told a far different story and indicated that Halbreiner's fiduciary responsibility to her employer, Customers, had been breached and compromised.

265.   Further, Halbreiner's assistance and collusion in this scheme created a loss of over $9 million. Halbreiner's communications and attempts to shield the other RICO Defendants were done deliberately to hinder discovery of this fraud. Following the statement by Fuoco that Halbreiner was paid, the full background of the scheme was uncovered.

266.   Customers was under the impression, furthered by Halbreiner and other Defendants, that this was a legitimate transaction and development project. At the bottom was a fraudulent SBLOC, which Customers believed to be legitimate because Halbreiner continued to scheme to defraud and failed to disclose to her employer the fraudulent conduct.

## *RACKETEERING ACTS*

267.   Within the Eastern District of Pennsylvania, and elsewhere, the RICO Defendants committed the following racketeering acts.

## **Racketeering Acts Involving Wire Fraud**

268.   From on or about December 2012, and continuing up to the date of this Complaint, the RICO Defendants committed multiple racketeering acts of wire fraud, as described with specificity below, resulting from the Defendants having devised, and having intended to devise, a scheme and artifice to defraud, for obtaining money and property (the Customers loan and other loans) by means of false and fraudulent pretenses, representations, and promises. In furtherance of this scheme, material misrepresentations and concealment of material facts were transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, in violation of 18 U.S.C. § 1343, as further described below.

269.   The following (and numerous) transactions and/or communications between and among

the RICO Defendants, which occurred within the Eastern District of Pennsylvania and elsewhere,

constitute wire fraud racketeering acts and are described in paragraphs i through lv below:

i.   In December 2012, Halbreiner (who, for purposes of this racketeering act and all other racketeering acts, was located within this District), via email correspondence, introduced the Lifestyle Defendants to Customers, initiating a $250,000 loan guaranteed by Popky, based upon a previous relationship with Rappaport.

ii.   In March 2013, Halbreiner emailed Rappaport an example of the Customers SBLOC, advising that any SBLOC would need to list Customers as beneficiary.

iii.   On April 3, 2013, Fuoco emailed Bonnie indicating that the entity generating the SBLOC would be Creative Financial Resources.

iv.   On April 5, 2013, Halbreiner emailed Jason Rauenzahn ("Rauenzahn"), a Customers employee, advising that the loan is short term bridge financing and that "the real estate purchased is left to help secure the [letter of credit] financing".

v.   On April 16, 2013, Halbreiner emailed to Customers' outside counsel, Timothy Duffy ("Duffy") a copy of a valuation report for the Bensalem Property to get the ball rolling on the loan. She also emailed the Wire Room at Customers asking about wiring and SWIFT capabilities.

vi.   On April 17, 2013, Halbreiner emailed Duffy to advise the LHG had obtained approvals to construct the building and only needed one other approval to do site work, despite the fact that no work would be done.

vii.   On April 25, 2013, Halbreiner was advised by Fuoco via email that Deutsche Bank would be providing the SBLOC (sometime thereafter, the provider was changed from Creative Financial Resources to Marko Capital, but the issuing bank would still be Deutsche Bank).

viii.   On May 8, 2013, Halbreiner emailed Duffy a copy of a SBLOC for review, issued by Marko Capital.

ix.   On May 13, 2013, Halbreiner emailed Rappaport and Duffy stating that she spoke to "Keith Stapleton" at Deutsche Bank of New York, a "specialist in the Letter of Credit department." Clearly, this person was not a representative of Deutsche Bank, as the SBLOC ended up being false.

x.   On May 13, 2013, Duffy warned Halbreiner via email that the documents were setting off "alarm bells"; Halbreiner forwarded the email to Rappaport, asking him for copies of the documents, which he sent back.

xi.   On May 14, 2013, Rappaport emailed a new SBLOC draft, which Halbreiner forwarded to Duffy for review, even though the borrower typically does not prepare the loan documents.

xii.  On May 14, 2013, Halbreiner forwarded via email the new SBLOC draft to Customers employees Thomas Jastrem and Tim Romig, advising that the SBLOC lists LHG, not Customers, as the beneficiary (Duffy later advised Halbreiner by letter that the reason for this is not explained).

xiii. On May 14, 2013, Duffy asked Halbreiner to confirm that the issuing bank is Deutsche Bank AG; however, Halbreiner replied via email that she could not contact anyone. When Duffy asked if Rappaport was getting the info as he said he would, Halbreiner responded via email that "we cannot get a contact". She later emailed the Swift Code for transfers.

xiv.  On May 15, 2013, Halbreiner advised Duffy via email that she spoke to her "contact" at Deutsche Bank regarding making a payment demand on the New York branch in the event of default.

xv.   On May 15, 2013, Halbreiner urged Duffy via email to complete his review quickly, as LHG would lose its investor. She advised that she ran the SBLOC language by "person at [Deutsche Bank] in that department", who made changes. She forwarded to Duffy emails from Keith Stapleton.

xvi.  Throughout the month of May 2013, Halbreiner, Rappaport and Duffy exchanged multiple emails refining the language of the Deutsche Bank SBLOC and signed agreements.

xvii. On or about June 17, 2013, Halbreiner forwarded via email a communication to third parties with a "proof of funds" letter to potential brokers.

xviii. On June 19, 2013, Halbreiner sent by email to JS Funds and Holdings a document "verifying liquid assets to cover SBLC fees".

xix.  On June 21, 2013, Halbreiner advised Tim Romig via that the SBLOC would now be issued by Citibank through a new provider, determined to be Argus Financial. On that same day, Halbreiner forwarded via email a series of communications to senior management at Customers advising that another standby letter of credit was being submitted after the initial Deutsche Bank letter was deemed counterfeit.

xx.   On June 27, 2013, Halbreiner admonished Fuoco over email that Popky was moving funds.

xxi.  On July 2, 2013, Halbreiner emailed Duffy to advise that a new entity, Argus Financial, would be providing an SBLOC and enclosed a draft, listing Customers as beneficiary. She also advised that Popky would put $200,000 in escrow prior to issuance.

xxii.     Duffy replied, wondering why Deutsche Bank's standard SBLOC wasn't being used, and Halbreiner responded that Argus would use the one they already edited to "make things simple" for them.

xxiii.    On July 17, 2013, Halbreiner received an email from Rappaport advising that "the first advance is only you, Dr. Popky and Milestone" (emphasis added).

xxiv.     On July 29, 2013, Halbreiner sent an email to Ronald Weichert at Deutsche Bank.

xxv.      On July 29, 2013, Halbreiner emailed Tim Romig and Craig Sinnamon of Customers advising that the SBLOC from Deutsche Bank was fraudulent.

xxvi.     On July 30, 2013, Halbreiner emailed Fred Rappaport at 5:04 p.m. with "FYI SPL Site" in the subject line outlining the apparent transpired fraudulent documents submitted by Deutsche.

xxvii.    On July 31, 2013, after more rounds of edits, Halbreiner notified Duffy via email that the SBLOC was fraudulent.

xxviii.   On August 1, 2013, Halbreiner initiated contact with Santiago via email.

xxix.     On August 2, 2013, Halbreiner emailed Duffy that "Fred has another good source", which ultimately turned out to be Metro.

xxx.      On August 5, 2013, Santiago emailed Halbreiner that she "will await [sic] for your email confirmation" and "that you are only waiting to fund the account." Halbreiner forwarded the email to Duffy, expressing a need to "proceed quickly and fund the account."

xxxi.     On August 5, 2013, Santiago emailed to Halbreiner a document showing "the particulars of HSBC Bank USA N.A.", which Halbreiner forwarded to Duffy. Another copy was sent by Halbreiner to Duffy on August 7, 2013.

xxxii.    On August 6, 2013, Halbreiner received an email from Santiago with attached draft SBLOC for HSBC Bank.

xxxiii.   On August 7, 2013, after verifying the language of the SBLOC from HSBC Bank, Halbreiner confirmed via email to Rappaport that the language was correct.

xxxiv.    On August 21, 2013, Kohl emailed Halbreiner and Rappaport stating that the HSBC SBLOC would be sent out in the mail that day.

xxxv.     On August 23, 2013, Rappaport forwarded via email to Halbreiner a "suspicious" email that said only, "TD line which is attached.

xxxvi.    Halbreiner then forwarded via email the email to Duffy on August 23, 2013 at 9:13 a.m. asking counsel to verify whether the language is acceptable; Duffy responded

by email at 10:32 a.m. stating that the language is standard and acceptable; he then advised that he would get the modification agreement and fee to her later this morning.

xxxvii.   On August 23, 2013, Rappaport emailed Halbreiner attaching new language, this time for TD Bank, which Halbreiner forwarded to Duffy.

xxxviii.  On August 27, 2013, Santiago emailed Halbreiner and Rappaport and indicated that a David Matos from TD Bank would call Halbreiner the next day.

xxxix.    On August 29, 2013, the day of funding on the $9 million loan, Halbreiner emailed Rappaport at **9:05 a.m.** stating, "<u>have not received yet it was supposed to be here by 8:30</u>," apparently in a panic at not having received the TD Bank SBLOC in a timely manner.

xl.        Rappaport replied at **9:09** stating "FedEx said they delivered it to the front desk signed by R. Moody."

xli.       Halbreiner responded at 9:10 a.m. and forwards the email to Jonathan Klass ("Klass"), an employee at Customers, asking if he can identify R. Moody; Klass responded at 9:22 a.m. that R. Moody worked at the credit union downstairs, a business unrelated to Customers in a separate location in the building.

xlii.      Rappaport responds at 9:35 a.m. claiming to be at the Customers' office with Klass and exclaiming, "<u>it looks fine. Happy Birthday ... we got it done!</u>"

xliii.     On August 29, 2013, Halbreiner emailed Rappaport and advised that "everything was disbursed."

xliv.      On December 31, 2013, James Hornack, an employee of Customers, emailed Halbreiner regarding Kohl's trying to reach her with "urgent" communication.

xlv.       On January 15, 2014, Halbreiner's husband, Robert Halbreiner, responds to Germetru@aol.com and Halbreiner regarding confirmation received for "Jay's save the date announcement," stating, "great at Philadelphia airport waiting for delayed flight to Greenville, South Carolina travel sucks."

xlvi.      On February 1, 2014, Kohl emailed a client with no relationship to Customers and CC'd Halbreiner, attaching "the SBLC language that Customers Bank like [sic]".

xlvii.     On October 29, 2014, Halbreiner emailed Rappaport regarding what she would need to initiate a new bridge loan. On November 3, she emailed Tim Romig, who advised that to get the loan, "they have to be really strong"; he asked for financials.

xlviii.    On November 4, 2014, Vicky invited Halbreiner to a Ladies' Night at the Spa via email.

xlix.      On December 2, 2014, Halbreiner emailed Rappaport asking for the signed documents between LHG and "the entity that supplied the L/C".

l.      On December 10, 2014, Duffy notified Halbreiner that the Bensalem Property, which was to be security for a bridge loan, was actually no longer owned by LHG but was now owned by Lifestyle REI.

li.      On January 28, 2015, Halbreiner emailed Rappaport about a rejected check from LHG's bank account; Rappaport advised that he covered it with his personal account.

lii.      On January 28, 2015, Rappaport emailed Halbreiner and requested a copy of Customers' appraisal of the Bensalem Property for purposes of obtaining another loan from a different bank.

liii.      On January 29, 2015, Halbreiner delivered a copy of the appraisal to Rappaport via email.

liv.      On July 13, 2015, Halbreiner emailed Tim Romig and Andrew Bowman to try to get an extension for LHG, as the maturity date on the $9 million loan was approaching. She represented that "the refinance looks to be ligit [sic]".

lv.      On July 14, 2015, after learning that Popky would not advance an escrow reserve, Halbreiner emailed Duffy's office to exercise the SBLOC.

### Racketeering Acts Involving Mail Fraud

270.      On or about July 29, 2013, Halbreiner, located at Customers Bank, received the fraudulent Deutsche Bank SBLOC via mail, as initiated and orchestrated by the Rappaport Enterprise.

271.      On or about August 29, 2013, Halbreiner, located at Customers Bank, received the fraudulent TD Bank SBLOC, via Federal Express, as initiated and orchestrated by the Rappaport Enterprise.

272.      Ultimately, the SBLOC turned out to be false – Customers' outside counsel attempted to contact the TD Bank branch listed on the SBLOC but discovered it was closed. The employee who signed the SBLOC, David Matos, was an employee at a branch in Canada and had not actually signed the document. The SBLOC was fictitious, just like the previous SBLOC issued.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages;

b)      Award counsel fees, costs and interest to Customers;

c)    Level treble damages against Defendants; and

d)    Grant such other and further relief as appropriate in this matter.

## COUNT TWO

**Civil RICO Conspiracy Pursuant to 18 U.S.C. § 1962(d) – RICO Defendants**

273.    Plaintiff repeats each of the allegations contained in Paragraphs 1 through 272 as if set forth herein at length.

274.    The RICO Defendants have conspired among themselves to violate the laws cited above, to commit fraud and to deceive Customers through a series and pattern of conduct as outlined above.

275.    The RICO Defendants engaged in a conspiracy to defraud Customers as set forth under the Racketeer Influenced and Corruption Organization Act ("RICO"), 18 U.S. Code § 1962(d).

276.    In violation of 18 U.S. Code § 1962(d), the RICO Defendants as outlined conspired with each other to conduct affairs of a RICO Enterprise in violation of 18 U.S. Code § 1962(d).

277.    Defendants acted in concert with one another in deceiving and defrauding Customers. Each knew or should have known that the others' conduct constituted a breach of duty and provided assistance to accomplish tortuous unlawful result.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages;

b)      Award counsel fees, costs and interest to Customers;

c)      Level treble damages against Defendants; and

d)      Grant such other and further relief as appropriate in this matter.

## COUNT THREE

### Negligence and Negligent Communication – All Defendants

278.    Plaintiff repeats each of the allegations in Paragraphs 1 through 277 as if set forth herein at length.

279.    Each of the Defendants communicated or helped communicate or facilitated communication of false, deceptive or materially misleading statements in the commission of fraudulent illegal acts, which damaged Customers.

280.    To the extent that Defendants who were involved in this transaction had reason to know of the false or fraudulent conduct and had duty to disclose same rather than through the actions or actions of facilitated fraud and deception. To the extent that each Defendant had acted negligently such negligence was a proximate cause of plaintiff's loss and is liable responsible for same.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages;

b)      Award counsel fees, costs and interest to Customers;

c)      Level punitive damages against Defendants; and

d)      Grant such other and further relief as appropriate in this matter.

## COUNT FOUR

### Breach of Fiduciary Responsibility – Halbreiner

281.    Plaintiff repeats each of the allegations in Paragraphs 1 through 280 as if set forth herein at length.

282.    By virtue of her capacity as a loan officer at Customers, Halbreiner breached her fiduciary responsibility to Customers. Halbreiner knew or should have known that her actions and inactions related to the fraudulent SBLOC as well as the underlying transaction that led to it would breach her fiduciary responsibility to Customers resulting in a loss in excess of $9 million.

283.    Halbreiner failed to disclose that there was subsequent funding in place from Kennedy Funding.

284.    Halbreiner failed to disclose and immediately identify that this loan was deceptive on its face, especially after she received the fraudulent Deutsche Bank SBLOC.

285.    Halbreiner consistently communicated to Rappaport concerning various aspects of this transaction.

286.    The fact that she had breached her fiduciary responsibility caused great harm to Customers.

287.    Halbreiner was employed as a Senior Lender for Customers. As part of her compensation, she was entitled to receive a bonus and related compensatory payments based upon loan generation and related performance criteria.

288.    Subsequent to the breach of fiduciary responsibility and the failure and default of the Lifestyle loan obligation, Halbreiner defaulted on her obligation and accordingly, as to that aspect is obligated to repay any and all funds to Customers for compensatory consequence-related damages.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages;

b)      Award counsel fees, costs and interest to Customers;

c)      Level punitive damages against Defendants; and

d)      Grant such other and further relief as appropriate in this matter.

## COUNT FIVE

### Violation of the Pennsylvania Uniform Fraudulent
### Transfer Act (PUFTA), 12 Pa.C.S.A. § 5104 – Lifestyle REI

289.    Plaintiff repeats each of the allegations in Paragraphs 1 through 288 as if set forth herein at length.

290.    LHG is the borrower with respect to the subject loan.

291.    Lifestyle REI is a limited partnership, which was the beneficiary and recipient of the Bensalem Property.

292.    The extension of the loan funded August 29, 2013 was for the development of the Bensalem Property.

293.    Subsequent to funding and upon information and belief, LHG transferred ownership of the Bensalem Property to Lifestyle REI.

294.    According to Fuoco, the purpose of the transfer was to avoid creditors.

295.    The transfer was executed to hinder creditors and to defraud Customers.

296.    There was no consideration paid for the transfer.

297.    LHG is essentially an insolvent corporation controlled by Rappaport, Vicky, Popky and unknown individuals and/or unknown corporations.

298.    At the time of the transfer, LHG was insolvent and incapable of creating an income. Subsequently, Defendants Popky, Rappaport and Vicky encumbered the Bensalem Property with an additional lien in the amount of approximately $3.5 million dollars.

299.    All transfers were made at a time when obligations were owed to Customers.

300.    The transfers made by the owners and controlling individuals and were made to hinder, delay and defraud Customers and to preserve property for Rappaport, Popky and Vicky's own use and benefit.

301.    As a result of the transfer, Popky, Rappaport and Vicky maintained possession or control of the assets through Lifestyle REI.

302.    Halbreiner knew about this transfer and/or failed to investigate and inform senior management of Customers about the transfer.

303.    As a result of the transfer, the loan was essentially unsecured, as the SBLOC was fraudulent and counterfeit, leaving Customers unsecured and unprotected.

304.    LHG was insolvent prior to the transfer, and the transfer was of essentially of all the assets of LHG.

305.    The transfer was made to an entity controlled by insiders of LHG.

306.    Further, upon information, belief, the remaining assets of LHG are unreasonably small in relation to estimated value of the transfer and are insufficient to satisfy the claims of Customers.

307.    The Defendants intended and believed or reasonably should have believed that as a result of the transfer, LHG lacked any ability to pay this debt. Further, Halbreiner's knowledge of this and acquiescence to this transfer has substantially injured her employer, Customers. Upon information and belief, Halbreiner was essentially an insider in the conspiracy to defraud Customers.

308.    These transfer was constructively fraudulent pursuant to 12 Pa.C.S. § 5104(a)(2).

309.    The transfer should be avoided or set aside pursuant to 12 Pa.C.S. § 5107 to the extent necessary to allow Customers to satisfy its claims.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages;

b)      Award counsel fees, costs and interest to Customers;

c)      Level punitive damages against Defendants; and

d)      Grant such other and further relief as appropriate in this matter.

## COUNT SIX

### Violation of the Pennsylvania Uniform Fraudulent
### Transfer Act (PUFTA), 12 Pa.C.S.A. §1505 – Popky, Rappaport and Vicky

310.    Plaintiff repeats each of the allegations in Paragraphs 1 through 309 as if set forth herein at length.

311.    Popky, Rappaport and Vicky are debtors of Customers by way of the fraudulent conduct and conspiracy to defraud Customers. Their conspiracy was fostered, assisted and abetted by Halbreiner.

312.    On July 21, 2015 or July 22, 2015, the entity known as LHG, which is the alter ego of Popky, Rappaport and Vicky, breached its obligations under the terms and conditions of the note.

313.    There was a fraudulent SBLOC, which induced Customers to extend $9 million.

314.    Rappaport, Popky and Vicky were notified of Customers' discovery of the fraudulent document. They have taken no steps to satisfy this obligation and have continued their wrongful conduct.

315.    Upon information and belief, Rappaport, Popky and Vicky have transferred assets to various entities, e.g., Popky's transfer to a trust account and/or trust agreement or trust entity located in California or other locations. It is unknown as to the exact number of trusts.

316.    Popky's transfer of funds taken from Customers at the time of the loan in the approximate amount of $500,000.00 constitutes a fraudulent transfer.

317.    LHG did not receive reasonably equivalent value for the transfer.

318.    As a result Popky's and other individuals' transfer of assets, the corporation is essentially insolvent.

319.    The transfers were made when LHG was insolvent.

320.    These actions constitute violations of PUFTA, 12 Pa.C.S.A. §5105.

321.    These transfers should be void or otherwise set aside pursuant to PUFTA, 12 Pa.C.S.A. §5107, to the extent necessary to allow Customers to satisfy its claims.

WHEREFORE, Customers requests that this Court:

a)    Enter judgment against the Defendants for compensatory consequential damages;

b)    Award counsel fees, costs and interest to Customers;

c)    Level punitive damages against Defendants; and

d)    Grant such other and further relief as appropriate in this matter.

## COUNT SEVEN

**Legal and Equitable Fraud – Rappaport, Popky, Vicky, Santiago and Kohl**

Plaintiff repeats each of the allegations in Paragraphs 1 through 321 as if set forth herein at length.

322.    Defendants provided Plaintiff with willfully and maliciously misleading documents including a fraudulent and/or deceptive SBLOC as well as other loan documents and business documents. The Defendants had a duty to disclose information to Customers.

323.    Further, there was a series of communication fostered by the Defendants as set forth herein, along with Halbreiner's failure to investigate the Defendants.

324.    These documents and communications constitute fraudulent and false representations and bank fraud.

325.    Defendants knew that these representations were false at the time when they provided them to Customers and knowingly made these representations with the intention that Customers would rely upon them in deciding to transfer and extend credit in the amount of $9 million.

326.    The Defendants knew that the SBLOC was fraudulent and in other ways misleading.

327.    Plaintiff relied upon Defendants' false and deceptive misrepresentations and omissions when deciding to extend credit in the amount of $9 million to LHG, which was an insolvent corporation and the alter ego of the various Defendants.

328.    Customers has been directly and in proximately injured as a result of the Defendants' fraudulent misrepresentations and omissions to the extent of over $9 million.

329.    On August 28, 2013, pursuant to the loan agreement, individuals caused a fraudulent, counterfeit or other unlawful SBLOC be sent to Customers via either the U.S. Postal Service, FedEx or other common carrier in order to induce Customers to extend credit in the amount of $9 million to

LHG. Upon information and belief, individuals including Halbreiner, Rappaport, Vicky, Kohl, Santiago and Popky knew that the SBLOC was fraudulent and deceptive.

330.    In connection with the SBLOC, it is believed that as part of the funding of the loan there was delivered by way of wire a transfer fee equal to the ten percent (10%) of the loan amount for the SBLOC. The SBLOC was funded by Customers as part of the loan agreement and said funds were transferred via wire and other source to Santiago and Metro.

331.    Customers as the lending bank provided the wire transfer to Metro pursuant to the agreement.

332.    During this time, Defendants fraudulently represented to Customers and other representatives that Metro was a prominent and well-established source with a branch office in Oklahoma. However, Santiago knew that it was a scheme to defraud Customers.

333.    Upon information and belief, Rappaport, along with Halbreiner and Popky, knew that said actions and inactions were deceptive.

334.    Metro, through its agent and representative Santiago, illegally acting as a legitimate bank, issued an SBLOC, thereby fraudulently representing that Metro was a bank and/or other financial institution and legally able to issue such SBLOC.

335.    Subsequently, Santiago, in connection with other co-conspirators including Rappaport, Popky and Vicky, engaged in fraudulent conduct to deceive and wrongfully misappropriate $9 million in Customers' funds.

336.    In reliance upon the fraudulent and  deceptive SBLOC, Customers provided the $9 million to LHG.

337.    Thereafter, Defendants used the funds not for the intended Facility Project, but to pay personal expenses, including extravagant vacations.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages;

b)      Award counsel fees, costs and interest to Customers;

c)      Level punitive damages against Defendants; and

d)      Grant such other and further relief as appropriate in this matter.

## COUNT EIGHT

### Request for Injunctive Relief to Restrain LHG, Lifestyle REI, and Lifestyle GP

Plaintiff repeats each of the allegations in Paragraphs 1 through 337 as if set forth herein at length.

338.   By virtue of the foregoing, Customers has demonstrated that the Defendants have fraudulently transferred assets in violation of PUFTA.

339.    PUFTA specifically provides for the entry of injunction in favor of a creditor and against both the debtor and any transferees to prevent disposition of transferred assets.

340.   As set forth herein, based upon the fraudulent documents prepared and submitted by the Defendants, entry of injunction under the circumstances presented is proper.

341.   Customers has clearly demonstrated a likelihood of a success on the merits and the balance in the equities in favor of the issuance of a junction against all Defendants including but not limited to Rappaport, Popky, Vicky and Halbreiner.

342.   Granting an injunction in favor of Customers will not result in any greater harm to the Defendants.

343.   Granting a preliminary injunction in favor of Customers is in the public interest.

WHEREFORE, Customers respectfully requests that a preliminary injunction issue immediately enjoining Rappaport, Vicky, Popky, Halbreiner and Santiago directly or in indirectly whether alone or in concert with others including any officer, agent, employee and/or representative therefrom including Lifestyle Healthcare Group; LHG; Lifestyle Real Estate I, GP, LLC and Lifestyle RE, I, LP from further disposition of the assets.

## COUNT NINE

### Civil Conspiracy – Halbreiner, Rappaport, Popky, Vicky, Santiago and Kohl

344.    Plaintiff repeats each of the allegations in Paragraphs 1 through 343 as if set forth herein at length.

345.    Rappaport, Vicky, Popky, Halbreiner, Santiago, Kohl and other John Does 1 through 20 conspired to scheme and engage in illegal and unlawful acts including the acquiescence and/or submission of a counterfeit and/or fraudulent SBLOC to Customers.

346.    The Defendants accomplished this by clandestine actions and interactions including working in consort to devise a scheme to allow Customers Bank to fund $9 million on worthless collateral.

347.    Upon information and belief, the Defendants intentionally misled Customers with the false and misleading SBLOC, including the submission of various communications including the Business Plan and investor documentation upon which they knew Customers would rely.

348.    Further, Halbreiner, a loan officer with Customers Bank, assisted in the conspiracy to defraud Customers by breaching her fiduciary responsibility in failing to safeguard Customers.

349.    Halbreiner along with Rappaport and other individuals conspired to defraud Customers.

350.    Throughout the process, Defendants devised schemes whereby the $9 million in addition to other funds from third parties had amassed to approximately $12 million.

351.    Upon information and belief, of the approximately $12 million, at least an estimated half of those funds went to the personal use of the Defendant individuals or related corporations, including Vicky's Spa.

352.    Upon information and belief, the Spa service was supported by funds from Customers.

353.    At no time did Customers agree to allow their loan funds to be siphoned and dissipated to a third-party entity – the Spa.

354.    Upon information and belief, these actions were deliberate attempts to defraud Customers.

355.    Upon information and belief, Rappaport has had a long lengthy history of defrauding third parties in business ventures and transactions.

356.    The Defendants engaged in legal and elicit communication including transfer of communication via email and written mail.

357.    As a direct result of the acts of civil conspiracy, Customers has been directly and indirectly damaged and sustained substantial losses.

WHEREFORE, Customers requests that this Court:

a)    Enter judgment against the Defendants for compensatory consequential damages;

b)    Award counsel fees, costs and interest to Customers;

c)    Level punitive damages against Defendants; and

d)    Grant such other and further relief as appropriate in this matter.

## COUNT TEN

### Conversion – Popky, Rappaport, Vicky and Halbreiner

358.    Plaintiff repeats each of the allegations in Paragraphs 1 through 357 as if set forth herein at length.

359.    Defendants, Rappaport, Popky, Vicky and Halbreiner unlawfully exercised dominion and control over the $9 million and illegally transferred various amounts to other entities, including third party corporations and limited liability companies.

360.    These transfers were made to the Spa, LMG, and Lifestyle Healthcare Group Healthcare ("LHGH").

361.    Transfers made to the Spa from the period of 2012 to 2015 were in the amount of $226,891.00.

362.    During that same period, LHGH received $2,937,549.27.

363.    LMG received $811,948.85.

364.    There were additional funds paid to Advanced Lifestyle I, LP.

365.    Further transfers incurred included a loan repayment to Popky in the amount of $350,000.00. This loan repayment was made at a time when LHG was in fact insolvent.

366.    Additional funds were transferred concerning land purchase in the amount of $2.5 million dollars. This appears to be the same land that was encumbered by Kennedy Funding from New Jersey.

367.    The parties have engaged in a systematic conversion of funds from Customers.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages;

b)      Award counsel fees, costs and interest to Customers;

c)      Level punitive damages against Defendants; and

d)      Grant such other and further relief as appropriate in this matter.

## COUNT ELEVEN

### Breach of Contract – LHG

368. Plaintiff repeats each of the allegations in Paragraphs 1 through 367 as if set forth herein at length.

369. LHG entered into a loan agreement with Customers.

370. LHG has defaulted on said obligation.

371. As part of the loan agreement, LHG was obligated to provide an SBLOC. Upon default, Customers attempted to execute and receive payment under the SBLOC t terms and conditions.

372. The SBLOC was not honored and was believed to be fraudulent and/or counterfeit.

373. LHG is in breach of the contract.

WHEREFORE, Customers requests that this Court:

a) Enter judgment against the Defendants for compensatory consequential damages;

b) Award counsel fees, costs and interest to Customers;

c) Level punitive damages against Defendants; and

d) Grant such other and further relief as appropriate in this matter.

## COUNT TWELVE

### Piercing the Corporate Veil/Alter Ego Theory – Rappaport, Popky, Vicky, the Popky Trust and Muck

374.    Plaintiff repeats each of the allegations in Paragraphs 1 through 373 as if set forth herein at length.

375.    Upon information and belief, each of the defendants including Rappaport, Popky, Vicky and Muck controlled and dominated the various insolvent corporations, including but not limited to LHG,  Lifestyle REI and Lifestyle GP.

376.    The corporations had no real business and no income, and they were insolvent; they are mere instrumentalities of the individuals running them. The corporations were the alter egos of the individuals who had defrauded Customers Bank of $9 million.

377.    Further, Rappaport, Popky, the Popky Trust, Vicky and Muck made various misrepresentations to Customers and their conspiracy was facilitated and aided by Halbreiner, who received payments or other compensation as a result of her orchestrating her assistance to Defendants.

378.    Upon information and belief, Muck was in charge of the website design for LHG, and said website was used to elicit other investors and Customers in order to create LHG as a viable entity. Upon information and belief, the corporation was insolvent, and never had any real capabilities of continuing.

WHEREFORE, Customers requests that this Court:

a)      Enter judgment against the Defendants for compensatory consequential damages;

b)      Award counsel fees, costs and interest to Customers;

c)      Level punitive damages against Defendants; and

d)      Grant such other and further relief as appropriate in this matter.

## COUNT THIRTEEN

### Violation of the Pennsylvania Uniform Fraudulent
### Transfer Act 12 PA C.S.A. 5101 Et Seq. – Disclaimer Trust, DRP, DHP, JBP and Kittka

379.    Plaintiff repeats each of the allegations in Paragraphs 1 through 378 as if set forth herein at length.

380.    Upon information and belief, Popky individually and as executor of the Estate of Janet Parker Popky ("Estate") transferred real property located at 8801 Crefeld Street, Philadelphia, Pennsylvania ("Crefeld Property") on March 12, 2014 and recorded the deed in the City of Philadelphia on March 28, 2014.

381.    The transfer of the Crefeld property was part of a scheme to defraud creditors, and said transfer of real property was made for no consideration or nominal consideration to the Disclaimer Trust.

382.    Upon information and belief, the transfer is made at a time when obligations were owed to Customers and at a time wherein George Popky was a principal of LHG and had obtained financing in excess of $9,000,000.00.

383.    The transfer was made by Popky and the Estate to Popky and to the Disclaimer Trust, over which DRP, DHP, JBP and Kittka are trustees.

384.    The transfer was made to insiders as defined by the Pennsylvania Fraudulent Transfer Act 12PA CSA 5101 et seq.

385.    Upon information and belief, George Popky has continued to retain control of the Crefeld Property.

386.    The transfer was done to insiders who are believed to have familiar relationships with Popky.

387.    The transfer was made of a valuable parcel – upon information and belief, the value of Crefeld Property is in excess of $1.3 Million.

388.    Upon information and belief, the property is unencumbered.

389.    Upon information and belief, the transfer was made for no consideration.

390.    DRP, DHP, JBP and Kittka are named as defendants as Trustees of the Disclaimer Trust. All Trustees are believed to be family members of Popky or have a familiar relationship.

391.    Said actions constitute a violation of the Pennsylvania Uniform Fraudulent Transfer Act.

392.    Said transfer was made at a time when substantial obligations were owed by LHG, an insolvent entity over which Popky exercised dominion and which Popky used as an alter ego as set forth herein.

393.    The transfer was made to insiders in violation of the Uniform Fraudulent Transfer Act. Popky has maintained control of the real property and used the trustee to shield creditor claims.

WHEREFORE, Plaintiff, Customers Bank, demands that this Court :

a)  Enter Judgment against Defendants, George L Popky MD; George L Popky, individually; Deborah R Popky; Donna H Popky; Jennifer B Popky and David Kittka as Trustees of the Janet Parker Popky Disclosure Trust for compensatory consequential damages and any relief the Court deems just and equitable;

b)  Rescind the transfer of real property located at 8801 Crefeld Street, Philadelphia, Pennsylvania;

c)  An award counsel fees, costs and interest;

d) Level punitive damages against Defendants George L Popky MD; George L Popky, individually; Deborah R Popky; Donna H Popky; Jennifer B Popky and David Kittka as Trustees of the Janet Parker Popky Disclosure Trust; and

e) Grant such other and further relief as appropriate in this matter.

SALDUTTI LAW GROUP

Dated: July 18, 2016                         BY:      ROBERT L. SALDUTTI, ESQUIRE (RS5492)
                                                      REBECCA K. MCDOWELL, ESQUIRE (RM3223)
                                                      BNY Mellon Center
                                                      1735 Market Street, Suite 3750
                                                      Philadelphia, PA 19103
                                                      (610) 994-1137
                                                      (610) 200-6272 FAX